**WESTSIDE WRECKER SERVICE, INC., Appellant,**

v.

**Patricia Davis SKAFI d/b/a Master Auto Body Shop and d/b/a North Loop Towing and Dwight Cannon d/b/a D.C. Wrecker, Appellees.**

**No. 01–10–00668–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Nov. 17, 2011.

Jennifer B. Hogan, Matthew E. Coveler, Richard P. Hogan Jr., Hogan & Hogan, L.L.P., William L. Bowers Jr., Hamel Bowers & Clark, C. Leland Hamel, Houston, TX, for Appellant.

William F. Harmeyer, William F. Harmeyer & Associates, P.C., Houston, TX, for Appellees.

Panel consists of Justices JENNINGS, SHARP, and BROWN.

## OPINION

HARVEY BROWN, Justice.

Westside Wrecker Service, Inc. challenges the trial court's judgment awarding damages for unpaid storage and towing fees to Patricia Davis Skafi, d/b/a Master Auto Body Shop and d/b/a North Loop Towing, and Dwight Cannon, d/b/a D.C. Wrecker. A jury found that Westside breached an oral contract with Skafi and Cannon, the parties had formed a partnership, and Westside breached various partnership duties to Skafi and Cannon. The trial court disregarded the jury's liability findings on breach of contract and partnership duties, as well as some of the jury's damages findings, but it entered judgment for Skafi and Cannon for unpaid towing and storage fees and attorney's fees.

In six issues, Westside contends that the trial court erred by awarding damages in the absence of a liability finding; there is no evidence to support Skafi and Cannon's damages; and challenges the trial court's award of attorney's fees. In five issues, Skafi and Cannon contend that the trial court erred in disregarding the jury's finding that Westside had failed to comply with its agreement "to timely pay for storage and free tows" performed by Skafi and Cannon because the statute of frauds does not bar enforcement of the parties' oral agreement; the trial court erred in granting judgment notwithstanding the verdict because the jury's partnership finding was supported by legally sufficient evidence of the statutory partnership factors and the statute of frauds does not apply to the jury's partnership finding; "[i]f the jury's

partnership finding is reinstated on appeal, this case should [be] remand[ed] for an accounting of Mr. Cannon's partnership damages"; and respond to Westside's challenges to the damages and attorney's fees awarded.

We reverse the trial court's judgment with respect to Westside,[1] and enter judgment that Skafi and Cannon take nothing on their claims against Westside.

## Background

In 2004, the City of Houston initiated the "SAFEClear" program to establish a system for the prompt removal of disabled vehicles from Houston's freeways, and it divided the freeways within the city into coverage segments, which would be assigned to specific tow truck operators for removal of disabled vehicles. Tow truck operators were permitted to submit bids for the job, and the winning bidders were awarded five-year contracts to provide exclusive towing services for the highways in their coverage area.

The four tow truck companies and their principals involved in this suit are: (1) Richard King, president of Westside, (2) Dwight Cannon, doing business as D.C. Wrecker, (3) Patricia Skafi, doing business as Master Auto Body Shop and North Loop Towing, and (4) Rex Owens, owner of Corporate Auto Sales and Miller Paint & Body.[2] In anticipation of the SAFEClear bidding process, King, Cannon, Skafi, and Owens discussed how their businesses could work together in pursuing SAFE-Clear contracts. The substance of these discussions and the nature of the parties' agreements are at the crux of this dispute. While much of what the parties did and did not agree upon is disputed, the parties did agree that Westside would bid on SA-FEClear segments 21–24, Corporate Auto would bid on segments 25–26, and Cannon and Skafi would not submit bids but would be identified as subcontractors in Westside's and Corporate Auto's bids.

The bid packages submitted by Westside and Corporate Auto advertised the group's collective experience: "We are four wrecker companies[;] collectively, we have over 100 years of experience in the wrecker/storage industry." The package also identified the group's cumulative equipment and assets. The city awarded the SAFEClear contracts for highway segments 21–24 to Westside and the contracts for segments 25–26 to Corporate Auto. Cannon and Skafi were subcontractors under Westside's and Corporate Auto's SA-FEClear contracts. Westside and Corporate Auto were subcontractors under each other's SAFEClear contracts.

After winning the bids, Westside, Corporate Auto, Cannon, and Skafi continued to try to hammer out their working relationship. Owens prepared a draft partnership agreement that made Westside and Corporate Auto partners. The draft agreement was not well received. Cannon and Skafi were offended that they were not included as partners, and King stated that Westside did not want to enter into a partnership with anyone else. Ultimately, the parties abandoned their efforts to enter into a written agreement. As Cannon described it: "[I]t seemed like everything that anybody wrote up, one or two people in the group didn't agree with it. . . . I mean, we just never got anything that anybody could agree [to] in writing."

---

1. Paragraph seven of the trial court's judgment grants a take-nothing judgment on Skafi and Cannon's claims against Richard King. This portion of the judgment has not been attacked on appeal and is affirmed.

2. Corporate Auto Sales is not a party to this appeal.

But the parties continued to work together in connection with the SAFEClear contracts. Westside, Corporate Auto, Cannon, and Skafi agreed on a rotation system that gave them equal time servicing each of the SAFEClear segments awarded to Westside and Corporate Auto, and they each paid an equal one-fourth share of the SAFEClear bid price and related expenses. The rotation system was intended to give each of them an equal opportunity to earn revenues from their participation in SAFEClear—"to keep the income as fair as it could be." Skafi and Cannon provided Westside and Corporate Auto cashier's checks for their one-fourth share of the bid fee. Three checks contained the following statement: "as partner in City of Houston Major Freeway Tow." The foursome hired Denny Messer to serve as their SAFEClear manager, and they agreed to each pay an equal share of his $120,000 salary.

Disputes arose between the parties during the performance of the SAFEClear contracts. Westside hoped to realize increased storage business as a result of working with the other members of the group. Westside's president, King, believed that Cannon and Skafi had agreed to close their storage lots and deliver storage cars to Westside in exchange for payment of towing charges and a commission on revenue. Cannon and Skafi did not feel they had bound themselves to any specific obligation to close their storage lots or deliver storage cars to Westside. Cannon and Skafi believed that Westside was not paying them properly for storage cars that

they did deliver to Westside. They also believed that Westside was not reimbursing them for "free tows" provided under the SAFEClear program, for which Westside and Corporate Auto received yearly reimbursements from the city.[3]

Westside complained that, once the city implemented the "free tow" system, the other towers' drivers stopped coming to work on time during their rotations and wandered outside of their segment area in search of higher paying tows. According to Westside, the poor performance of the other towing companies' drivers caused the city to threaten to take away its SAFEClear contracts. This concerned Westside because Westside had no ability to control the other towing companies' drivers.

Ten months after the city awarded the SAFEClear contracts, Westside and Corporate Auto agreed that they would stop providing services on each other's segments and concentrate on their own segments instead. Westside remained dissatisfied with Cannon's and Skafi's drivers. Four months later, Westside sent Skafi a termination notice and sent Cannon a letter demanding that his company pay Westside certain fees, repair non-operational GPS on Cannon's trucks as required by the city's contracts, and comply with rules previously adopted by the parties, if it wished to continue to service Westside's SAFEClear segments. Westside later terminated Cannon from its SAFEClear segments. According to Cannon and Skafi, Westside did not terminate them for performance reasons. Rather, after the city eliminated the fees it originally charged

---

**3.** As originally envisioned, the SAFEClear program required drivers of disabled vehicles to pay a flat fee of $75 to the tow truck operator. This aspect of the program was unpopular with voters, and the program was revamped to require tow truck operators to tow disabled cars off the freeway and to a side street at no cost to the driver. The city

agreed to reimburse the operators for these "free tows" at a rate of $50 per tow. Thus, Westside and Corporate Auto received reimbursements from the city for the free tows provided in their respective SAFEClear segments. They could then reimburse Cannon and the Skafis for their "free tows."

for the SAFEClear contracts, Westside no longer needed them to contribute to the SAFEClear expenses and eliminated their subcontracts to maximize its own profits.

Skafi and Cannon brought this action, alleging claims for breach of fiduciary duty, breach of contract, and promissory estoppel, and requesting injunctive relief and an accounting. Skafi and Cannon pled that their business arrangement with Westside and Corporate Auto was a joint venture. Westside denied Skafi and Cannon's allegations and pled affirmative defenses including the statute of frauds, prior breach, and failure to mitigate. Westside also pled offset and brought counterclaims against Skafi and Cannon for breach of contract and a declaratory judgment that Westside was never a partner with Skafi or Cannon, that Skafi and Cannon had no rights or interest in Westside's SAFEClear contracts, and that the parties' oral agreement was terminable at will.

After a seven-day trial, the jury made numerous findings regarding the agreements and interactions between the parties. The jury rejected Westside's recollection of the parties' agreement, finding that (1) Skafi had not agreed to close her storage lot, (2) neither Skafi nor Cannon had agreed to require their drivers to tow all non-repairable vehicles to Westside's storage lot, and (3) the parties had not agreed that the parties could terminate the agreement at any time for any reason. The jury also rejected Westside's failure to mitigate defense.

With respect to the jury question on Westside's compliance with the parties' agreements, the charge instructed the jury that the parties had agreed to the following: (1) Skafi and Cannon would be subcontractors for Westside on its SAFEClear segments; (2) all parties would require their drivers to comply with the city's tow truck ordinances and regulations, the SAFEClear program rules, and the terms of the SAFEClear contract between the city and Westside or Corporate Auto; (3) each party would pay their fair share of reasonable dispatch and administrative charges incurred by Westside; and (4) Westside would timely pay for storage and free tows performed by Skafi and Cannon on Westside's SAFEClear segment. The jury found that Skafi and Cannon complied with the parties' agreements but Westside did not. No damage question was predicated on the breach of contract findings, but the jury separately awarded Skafi and Cannon damages for unpaid storage fees and awarded Cannon damages for unpaid free tows.

The jury charge also asked whether Westside created a partnership with Skafi, Cannon, and Corporate Auto to conduct the SAFEClear business, to which the jury answered "yes." The jury then found that Westside breached its duties of loyalty and care to Skafi and Cannon, and it awarded lost profit damages to Skafi on this basis. No question was submitted on damages to Cannon as a result of Westside's breach of these duties.[4] The jury also found that Westside failed to comply with its fiduciary duty to Skafi and Cannon.[5] But it found that Skafi suffered no damages as a result

---

4. This may be a result of the trial court's mid-trial ruling excluding Cannon's lost profits damage model. Neither party challenges that ruling on appeal.

5. The jury charge required the jury to find a breach of the duties of loyalty and care, plac-

ing the burden of proof on the plaintiffs for these questions. But the jury charge required the jury to find compliance with the fiduciary duty, placing the burden of proof on the defendant for this question.

of this breach, and the charge did not include a question on breach of fiduciary damages to Cannon. Predicated on findings that Westside breached its duties of loyalty, care, or as a fiduciary, the jury found that the harm to Skafi and Cannon resulted from malice or fraud and awarded exemplary damages to both.[6] The jury found that Skafi and Cannon complied with their fiduciary duty to Westside. The jury also awarded attorney's fees.

The parties filed numerous post-judgment motions. Westside filed a motion to disregard some or all of the jury's findings on the grounds that no partnership existed as a matter of law, the statute of frauds bars Skafi and Cannon's recovery, the evidence was not legally sufficient to support the damages awards, the lost profits and unpaid fee awards could not support exemplary damages, and the attorney's fees award should be denied or reduced. Skafi and Cannon moved for interlocutory judgment on the jury verdict, appointment of a receiver over the partnership, and an accounting and appointment of a Master in Chancery to serve as an auditor. Skafi and Cannon also sought leave for a post-trial amendment of their breach of contract pleadings to include unpaid towing fees or, alternatively, to plead such damages as unjust enrichment.

The trial court granted Westside's motion to disregard the jury's answers with respect to question four (Westside's breach of contract) and questions eight through twenty (existence of a partnership, breach of duties of loyalty, care and as a fiduciary,

Skafi's lost profits, and exemplary damages). This ruling left only three jury findings in place: the unpredicated damages questions regarding unpaid storage and towing (questions twenty-five and twenty-six) and the attorney's fees question (question twenty-seven).[7] The trial court denied Skafi and Cannon's motion for post-trial amendment of their pleadings to include a claim for unpaid towing fees but nevertheless awarded Cannon the unpaid towing fees found by the jury.[8] In its final judgment, the trial court ordered that Westside pay Skafi and Cannon the unpaid storage and towing fees found by the jury, together with pre- and post-judgment interest and attorney's fees. The trial court did not award exemplary damages or Skafi's lost profits.

After the judgment, Westside moved for (1) a take-nothing judgment in its favor notwithstanding the jury verdict, (2) new trial or, alternatively, remittitur, and (3) modification, correction, or reformation of the judgment. The trial court denied Westside's post-judgment motions.

### Standard of Review

■ Westside raises a legal sufficiency challenge to the jury's findings relating to the existence of a partnership and to unpaid storage and towing damages. When a party attacks the legal sufficiency of the evidence to support an adverse jury finding on an issue for which it did not have the burden of proof at trial, it must show that no evidence supports the jury's adverse finding. *Exxon Corp. v. Emerald*

6. Because the jury charge contains no questions for damages to Cannon resulting from Westside's breaches of its duties of loyalty, care, and as a fiduciary, it is unclear what harm to Cannon could support the exemplary damage award to him.

7. The remaining jury questions are questions in which the jury found that Skafi and Can-

non did not breach their agreements or duties and questions that were not answered due to the answer to the corresponding predicate question.

8. No party argues on appeal that this award does not conform to the pleadings.

*Oil & Gas Co., L.C.,* 348 S.W.3d 194, 215 (Tex.2011). Evidence is legally sufficient to support a jury finding if it "would enable reasonable and fair-minded people to reach the verdict under review." *Id.* (quoting *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005)). In reviewing the legal sufficiency of the evidence supporting a jury finding, we "credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Id.* (quoting *City of Keller,* 168 S.W.3d at 827).

The remaining disputes on appeal focus not on the sufficiency of the evidence to support the jury's findings but on the legal effect of the jury's findings. These are questions of law, which we review under a de novo standard. *See Nguyen v. Yovan,* 317 S.W.3d 261, 267 (Tex.App.-Houston [1st Dist.] 2009, pet. denied) (holding that whether contract falls within statute of frauds is question of law, which we review de novo).

### Westside's Appeal

### A. The trial court erred in awarding Skafi and Cannon damages for unpaid towing and storage fees

In its first issue, Westside contends, in part, that the parties' oral agreement is barred by the statute of frauds and, although the trial court properly disregarded the jury's breach of contract finding on that basis, it erred in awarding Skafi and Cannon towing and storage damages because there was no liability finding left to support the damages. In their fourth and second issues, Skafi and Cannon argue that the trial court erred in disregarding the jury's breach of contract findings because the statute of frauds does not apply. They also argue that the jury findings on towing and storage damages may stand alone and need not be supported by a separate liability finding.

### 1. Skafi's and Cannon's damages arise from their agreement with Westside regarding towing and storage

Jury question twenty-five asked:

What sum of money, if any, if paid now in cash, by Westside, would fairly and reasonably compensate Dwight Cannon for the following?

. . .

a. Unpaid free tows from January 1, 2005 to September 30, 2008.

b. Unpaid storage from January 1, 2005 to November 30, 2005.

Similarly, question twenty-six asked:

What sum of money, if any, if paid now in cash, by Westside, would fairly and reasonably compensate Patricia Davis Skafi for unpaid storage from January 1, 2005, to October 31, 2005?

Although these questions were not expressly predicated on the jury's answer to question four—the breach of contract question—a relationship is evident on the face of the charge. Question four instructed the jury that the parties had made a number of agreements, among them: "Westside agreed to timely pay for storage and free tows performed by Ms. Skafi and M[r]. Cannon on Segments 21 through 24." It then asked if Westside failed to comply with the agreement, to which the jury answered "yes."

Skafi and Cannon argue that, as the instruction to question four indicates, they proved this agreement as a matter of law. Therefore, they assert, there was no need to predicate the jury's damages awards in questions twenty-five and twenty-six on the jury's answer to question four. Skafi and Cannon further contend that the damages questions subsume a liability finding because they ask what sum "if any" would compensate Skafi and Cannon. Finally, they assert that Westside failed to object

to the submission of questions twenty-five and twenty-six without predication on a finding in question four that Westside breached its agreement.

■ A liability finding is essential to the award of damages unless liability is established as a matter of law or uncontested. *See Fire Ins. Exch. v. Sullivan*, 192 S.W.3d 99, 107 (Tex.App.-Houston [14th Dist.] 2006, pet. denied); *Mitchell v. Bank of Am., N.A.*, 156 S.W.3d 622, 627 (Tex. App.-Dallas 2004, pet. denied); *Turner v. Lone Star Indus., Inc.*, 733 S.W.2d 242, 246 (Tex.App.-Houston [1st Dist.] 1987, writ ref'd n.r.e.). Under certain circumstances, the court of appeals may deem a finding in support of the trial court's judgment. *See* Tex.R. Civ. P. 279; *Gulf States Utils. Co. v. Low*, 79 S.W.3d 561, 565 (Tex. 2002); *see also Emerson Elec. Co. v. Am. Permanent Ware Co.*, 201 S.W.3d 301, 318 (Tex.App.-Dallas 2006, no pet.) (refusing to imply DTPA liability finding to support award of additional damages found in unpredicated jury question on lost good will). But we need not decide whether questions twenty-five and twenty-six could stand alone without the liability finding in question four or whether a liability finding should be deemed solely on the basis of questions twenty-five and twenty-six because Skafi and Cannon rely on the same basis for liability with respect to all three questions: Westside's agreement to pay for towing and storage, which is set forth in the instructions to question four. Skafi and Cannon do not argue an alternative basis for recovering the towing and storage damages.[9]

Thus, if the statute of frauds bars enforcement of Westside's alleged agreement to pay Skafi and Cannon for storage and free tows, the jury's findings on all damages must be disregarded.

**2. The statute of frauds bars Skafi's and Cannon's recovery of unpaid storage and "free tow" damages**

■ Under the statute of frauds, a promise or agreement that cannot be fully performed within one year is not enforceable unless there is a writing signed by the party against which enforcement is sought. Tex. Bus. & Com.Code § 26.01(a), (b)(6). Because there is no written agreement between the parties on the subject, the issue is whether the parties' oral agreement regarding storage fees and "free tow" reimbursements is subject to the statute of frauds. Westside contends that the parties tied the duration of their agreements to the five-year term of Westside's SAFEClear contract with the city.[10] Therefore, Westside asserts, the agreements were for a term longer than one year and are barred by the statute of frauds. Skafi and Cannon argue that Westside's obligation to pay for free tows and storage arose out of their at-will subcontractor relationship with Westside and the city. They argue that such at-will agreements can be fully performed within one year and, therefore, are not barred by the statute of frauds.

The problems with Skafi and Cannon's position are two-fold. First, the jury found that the parties could not terminate their agreement at-will. Although Skafi

9. At oral argument, counsel for Skafi and Cannon indicated that Westside's obligation to pay Skafi and Cannon for storage fees and Cannon for free tows was part of their subcontractor relationship with Westside. This theory was not submitted to the jury. The only jury question on breach of contract was question four, which globally addressed the parties' various alleged promises in a single question.

10. The SAFEClear contracts were eventually extended to a five-and-one-half-year term, but the testimony generally references the original five-year term.

and Cannon now point to Westside's contention at trial that it could terminate the agreement at-will, Skafi and Cannon took the position at trial that Westside could not terminate their agreement at-will. The jury agreed with Skafi and Cannon, and no party has challenged this finding on appeal. The parties and this Court are therefore bound by the jury's finding. *E.g., Abatement Inc. v. Williams,* 324 S.W.3d 858, 862 (Tex. App.-Houston [14th Dist.] 2010, pet. denied) ("unchallenged jury findings are binding"); *Carbona v. CH Med., Inc.,* 266 S.W.3d 675, 687 (Tex. App.-Dallas 2008, no pet.) (same).

Second, Skafi and Cannon both testified that their agreement with Westside was intended to run for the five-year term of Westside's SAFEClear contracts, unless the city terminated the SAFEClear contract sooner. Skafi testified that she expected the group of four's business arrangement to last for five years unless the city terminated the SAFEClear contracts earlier, which was a concern due to litigation over the SAFEClear program. She also testified that Westside breached the parties' agreement by terminating her before the end of the five-year term. Cannon provided similar testimony:

A. The day that we shook hands and agreed to a deal, it was for a five-year city contract or until the contract ended.... [I]f we weren't happy at the end of that time, I could go and start all over and bid again, or whatever the process would be with the city."

Q. So the business deal that you are describing, each party, according to you, contemplated that it would last for five years?

A. That's correct, or until the contract ended.

Skafi and Cannon attempt on appeal to make a distinction between their agreement with Westside and their "subcontractor relationship as to the [c]ity," but they did not pursue any liability theory at trial that would allow them to recover from Westside on the basis of their at-will subcontract with the city. All of the testimony links the parties' relationship and obligations to each other with the term of the SAFEClear contracts.[11] The right to recover for "free tows" is directly referable to the SAFEClear contracts.

Skafi and Cannon rely on *Clear Lake City Water Authority v. Clear Lake Utilities Co.,* 549 S.W.2d 385, 390 (Tex.1977) to support their contention that their agreements with Westside constituted "continuing contracts" that were terminable at-will. In *Clear Lake City Water Authority,* the Court observed that "contracts which contemplate continuing performance (or successive performances) and which are indefinite in duration can be terminated at the will of either party." *Id.* The issue in *Clear Lake City Water Authority* was not a statute of frauds issue but, rather, whether the water authority could lawfully terminate its written contract with a utilities provider when the contract did not contain a provision addressing duration. *Id.* at 388. The Court held that, if the water authority could not terminate its contract with the utility provider at will, the contract resulted in an improper restriction on the water authority's exercise of its governmental powers. *Id.* at 391. Such a contract would be void ab initio. *Id.* The Court then concluded that, because the parties could not have intended

---

**11.** The evidence demonstrated that, at the time the agreements were reached, the parties expected to continue all of their obligations to each other for the term of the SAFEClear contract. There is no controverting evidence indicating that the parties contemplated a different or lesser term for any "side deal."

their contract to be void, the parties must have intended their contract to be terminable at will. *Id.* at 392.

Here, however, there is no contention that the contract would be void ab initio if it were not terminable at-will, and the parties' agreement was not "indefinite in duration." Both Cannon and Skafi testified that they intended their agreement with Westside to last for five years, unless the SAFEClear contracts were terminated sooner. Although the city had a contractual right to terminate the SAFEClear contracts, the possibility of early termination does not convert the parties' five-year contracts into contracts of indefinite duration. A contract for performance that is intended to span a period of more than one year falls within the statute of frauds even if the contract may be terminated within one year upon the happening of some event other than completed performance.[12] *See Gilliam v. Kouchoucos,* 161 Tex. 299, 340 S.W.2d 27, 29 (1960) (holding that ten-year employment contract providing for termination upon death of employee was subject to statute of frauds); *SBC Operations, Inc. v. Bus. Equation, Inc.,* 75 S.W.3d 462, 466 (Tex.App.-San Antonio 2001, pet. denied) (stating that contract for services for period of more than one year was governed by statute of frauds despite possibility that service provider could be terminated within one year); *Collins v.*

*Allied Pharmacy Mgmt., Inc.,* 871 S.W.2d 929, 934 (Tex.App.-Houston [14th Dist.] 1994, no writ) (holding that employment contract for three years was within statute even though under agreement employee could be terminated at any time for cause); *Mann v. NCNB Texas Nat'l Bank,* 854 S.W.2d 664, 668 (Tex.App.-Dallas 1992, no writ) (concluding that loan agreement with three-year repayment term was within statute notwithstanding possibility that debtor would repay loan within year from its making); *Guffey v. Utex Exploration Co.,* 376 S.W.2d 1, 5 (Tex.Civ.App.-San Antonio 1964, writ ref'd n.r.e.) (holding that twenty-year gas contract was within statute of frauds even though contract could be terminated if wells ceased to produce gas within first year).

Here, Skafi and Cannon asserted, and the jury found, that Westside did not have the right to terminate their agreement at-will. Although their agreement could have been terminated within the first year upon the happening of some event—specifically, the city's termination of the SAFEClear program—that possibility does not constitute full performance as contemplated by the parties and does not remove the parties' agreement from the statute of frauds. *See Gilliam,* 340 S.W.2d at 29; *SBC Operations,* 75 S.W.3d at 466; *Collins,* 871 S.W.2d at 934; *Mann,* 854 S.W.2d at 668; *Guffey,* 376 S.W.2d at 5. Enforcement of

---

12. By contrast, contracts in which the contemplated performance may or may not span a period of more than one year fall outside the statute of frauds. *Compare Young v. Ward,* 917 S.W.2d 506, 510–11 (Tex.App.-Waco 1996, no writ) (contract for performance for length of one party's life was outside statute of frauds because, if party died within one year, contract would have been fully performed within one year), *with Chevalier v. Lane's, Inc.,* 147 Tex. 106, 213 S.W.2d 530, 532–33 (1948) (employment contract for specified period in excess of one year was within the statute of frauds despite possibility that employee could die within one year). This is because the statute of frauds applies to "an agreement which is not to be performed within one year" rather than an agreement that may not be terminated within one year. TEX. BUS. & COM.CODE ANN. § 26.01 (West 2009). Termination of a contract may occur in the absence of completed performance, but such a termination does not alter the applicability of the statute of frauds to the contract. *See Gilliam v. Kouchoucos,* 161 Tex. 299, 340 S.W.2d 27, 28–29 (1960); *Young,* 917 S.W.2d at 511.

the parties' oral agreements regarding storage and "free tows" is barred by the statute of frauds.

Because there is no enforceable contractual obligation for Westside to pay Skafi and Cannon for storage and free tows, there is no basis upon which the trial court could have held Westside liable for the storage and free tow damages it awarded. We hold that the trial court erred in awarding these damages. We therefore sustain Westside's first issue as it relates to enforcement of the parties' agreements and the availability of towing and storage fee damages.[13]

## B. Skafi and Cannon may not recover attorney's fees

■ In its fourth issue, Westside challenges the trial court's award of attorney's fees on the ground that Skafi and Cannon are not prevailing parties. A party can recover attorney's fees under section 38.001(8) only if he or she is the "prevailing party" and recovers actual damages on a breach of contract claim. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 38.001(8) (West 2008) (allowing a party who prevails on a breach of contract claim to recover his or her attorney's fees); *Green Int'l, Inc. v. Solis*, 951 S.W.2d 384, 390 (Tex.1997); *Crounse v. State Farm Mut. Auto. Ins. Co.*, 336 S.W.3d 717, 720 (Tex.App.-Houston [1st Dist.] 2010, pet. denied). We have held that Skafi and Cannon cannot recover their breach of contract damages. They therefore cannot recover attorney's fees

under Chapter 38. *See Green Int'l*, 951 S.W.2d at 390; *Crounse*, 336 S.W.3d at 720.

We therefore sustain Westside's fourth issue.[14]

## Skafi and Cannon's Cross–Appeal

In their second issue, Skafi and Cannon assert that the trial court erred in disregarding the jury's findings on the existence of a partnership (question eight) and the related questions on breach of duty (questions nine, ten, twelve, and eighteen), damages (questions eleven, thirteen, fourteen, and fifteen) and exemplary damages (questions sixteen, seventeen, nineteen, and twenty). Skafi and Cannon contend that the jury's partnership finding is supported by legally sufficient evidence of the parties' conduct, in conformance with the requirements of the Texas Revised Partnership Act. They further argue that the statute of frauds does not apply because a partnership may be formed by actions without an agreement. Alternatively, they argue that the statute of frauds does not apply because the partnership agreement could have been performed within one year. Westside takes the opposite position on each of these arguments.

## A. Evidence of a partnership

The parties agree that the former Texas Revised Partnership Act governs this partnership dispute. *See* Act of May 31, 1993, 73d Leg., R.S., ch. 917, § 1, 1993 Tex. Gen.

---

13. In light of our holding on this issue, we need not reach Westside's second issue—relating to the absence of a liability finding with respect to the existence of a partnership—or its third issues—challenging the sufficiency of Skafi and Cannon's damages evidence. We likewise overrule Skafi and Cannon's first and second issues, which, respectively, challenge the trial court's decision to disregard the jury's breach of contract finding and assert

that the damages question subsumes a liability finding.

14. In light of our holding on this issue, we need not reach Westside's fifth and sixth issues, raising other challenges to the attorney's fees award. We also need not reach Skafi and Cannon's third issue relating to the reasonableness of the attorney's fees and the failure to segregate.

Laws 3887, 3890 (Revised Statutes art. 6132b–2.02(a) to 2.03(a), expired Jan. 1, 2010) (TRPA).[15] Under TRPA, five factors may be considered to determine whether a partnership was created:

(1) receipt or right to receive a share of profits of the business;

(2) expression of intent to be partners in the business;

(3) participation or right to participate in control of the business;

(4) sharing or agreeing to share:

 (A) losses of the business; or

 (B) liability for claims by third parties against the business; and

(5) contributing or agreeing to contribute money or property to the business.

TRPA art. 6132b–2.03(a); *Ingram v. Deere,* 288 S.W.3d 886, 896 (Tex.2009); *see also* TEX. BUS. ORG.CODE ANN. § 152.052(a) (West 2010) (identifying same factors for creation of a partnership). Skafi and Cannon contend that the parties, through their conduct, satisfied each of these five factors.

In *Ingram,* the Supreme Court of Texas held that, unlike the common law, TRPA did not require proof of each of these elements to establish a partnership. *Ingram,* 288 S.W.3d at 896. Instead, all of these factors should be considered in determining whether a partnership exists and no single factor is determinative. *Id.* at 896–97. Under this totality-of-the-circumstances test, even conclusive evidence of only one factor normally will not be sufficient to establish the existence of a

partnership. *Id.* at 898. On the other hand, conclusive evidence of all five factors will establish a partnership as a matter of law. *Id.*

TRPA also lists circumstances that, alone, do not indicate that a person is a partner in a business, including the right to a share of profits as compensation to an employee or independent contractor or the right to a share of gross returns or revenues. TRPA art. 6123b–2.03(b)(1)(B), (b)(3); *Carpenter v. Phelps,* —— S.W.3d. ——, —— – ——, 2011 WL 1233312 (Tex. App.-Houston [1st Dist.] 2011, no pet.); *see also* TEX. BUS. ORG.CODE ANN. § 152.052(b). The jury question on the existence of a partnership largely tracks the language of TRPA with respect to the factors to consider and the circumstances that cannot, alone, indicate the existence of a partnership.

### 1. Sharing profits

Shared rights to profits and to control the business are generally considered the most important factors in establishing the existence of a partnership. *Ingram,* 288 S.W.3d at 896; *see also Big Easy Cajun Corp. v. Dallas Galleria Ltd.,* 293 S.W.3d 345, 348 (Tex.App.-Dallas 2009, pet. denied) ("The most important of these factors are sharing profits and participating in the control of the business."). It is undisputed that the parties did not share or account for the profits from their individual SAFEClear operations. There is no evidence that the four companies pooled their profits and then divided them among themselves or were entitled to an account-

**15.** TRPA expired on January 1, 2010. After that date, the Texas Business Organizations Code applied to all partnerships, "regardless of their formation date." *Ingram v. Deere,* 288 S.W.3d 886, 905 n. 4 (Tex.2009). Both TRPA and the TBOC identify the same five factors for determining whether parties have formed a partnership. *Compare* TEX. BUS. ORGS.CODE ANN. § 152.052(a) (West Supp. 2011), *with* TRPA art. 6132b–2.03. Because the parties argue under TRPA, and the factors are the same under TBOC, we will discuss the parties' arguments with respect to TRPA and include citations to the relevant provision of the TBOC.

ing regarding each other's profits.[16] The parties' profits varied because of difference in their individual expenses and individual revenues from the services they provided on the SAFEClear segments.

Skafi and Cannon contend that the parties' equal sharing of certain expenses and their rotation system intended to keep revenues "fair" essentially amounted to sharing profits, stating that "the difference between equalized revenue and the equal sharing of expenses generated net profits to each party from the parties' SAFEClear business (and from which each party then paid their individual expenses)." They cite the following evidence in support of this contention:

- testimony from King that each of the parties was responsible for paying twenty-five percent of the SAFEClear fees charged by the city;
- testimony from Owens that each of the parties was responsible for twenty-five percent of the SAFEClear fees, Messer's salary, dispatch costs, rent and other miscellaneous expenses associated with the SAFEClear segments;
- testimony from Skafi that they divided the SAFEClear coverage areas into four segments for each of the parties to rotate through "so that everybody had an equal opportunity as to what was being available out there" and that this agreement was something that would "equalize the revenue between the four"; and
- testimony from Cannon that they divided the SAFEClear coverage areas into four segments for the parties to rotate through so that they would each have an equal opportunity to work the more valuable and less valuable areas and that this agreement was "a way to

equalize revenues" from the SAFEClear coverage areas.

We conclude that this evidence does not demonstrate a sharing of profits for reasons relating to both sides of a profits calculation: expenses and revenues. First, the evidence demonstrates that the parties did not share all of the expenses for their SAFEClear-related operations. Instead, each company bore some of its own expenses, including purchasing its own equipment, installing GPS on its trucks, and paying its drivers. *See Ingram*, 288 S.W.3d at 898–99 (holding that there was no evidence of profit sharing when, even assuming right to share in gross revenues, there was no evidence that party's claimed contribution to expenses was sufficient to satisfy all of alleged partnership's expenses, leaving only profits to split).

Second, while the parties' intentions were that each party would have an equal opportunity to earn revenues from the SAFEClear segments, we are not persuaded that the evidence establishes that the parties' revenues actually were equal or that the parties had any right to equalization of their individual revenues. To the contrary, the evidence is that each party retained its own individual revenues from their own work. Cannon testified, "We shared the freeway to keep the income as fair as it could be, but we didn't share amongst ourselves, no." King and Cannon both testified that the parties' revenues and profits were determined by the work they performed individually and not by any pooling of revenues or profits. Skafi's damage model is also consistent with each party retaining the revenues earned from its individual performance of services rath-

---

**16.** Texas courts have recognized a distinction between a right to a share of revenues and a right to a share of profits in this context. *See*

*Ingram*, 288 S.W.3d at 899 (citing *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 176 (Tex.1997)).

er than any sharing of revenues. In short, the parties shared in an opportunity but not in profits.

The first factor suggests the absence of a partnership.

**2. Expression of intent to be partners**

When considering whether the parties expressed an intent to be partners, courts look at the parties' speech, writings, and conduct. *Ingram*, 288 S.W.3d at 899. "Evidence of expressions of intent could include, for example, the parties' statements that they are partners, one party holding the other party out as a partner on the business's letterhead or name plate, or in a signed partnership agreement." *Id.* at 900. This inquiry is "separate and apart from the other factors" and should only include evidence not specifically probative of the other factors. *Id.* at 899–900.

Skafi and Cannon point to the following evidence that they assert demonstrates an expression of intent to be partners:

- Skafi and Cannon included the phrase "as partner in City of Houston Major Freeway Tow Agreement" on three checks, one of which was to Westside.
- Owens testified that he called everyone in the group of four "loose partners" because "Richard King and myself had the full responsibility to the City of Houston[,] and Mr. Cannon and Mr. Skafi did not have that responsibility."
- When asked whether the group expressed that they were partners and who made such expressions, Skafi responded:

 Myself, Mr. Cannon, Mr. Skafi, we discussed—Mr. Owens—you know, we all discussed the fact that we were all sharing—Mr. King—that we all shared everything equally. We shared the expenses, we shared the

responsibilities of participating in this program equally.

- Cannon testified: "We had came to an agreement that we would have a four-way partnership, 25 percent, in the SAFEClear program only, nothing else[.]" He also testified that King identified him and Skafi as "a partner in our group" to others at SAFEClear operators' meeting.

- Owens drafted a partnership agreement for the group.

Skafi and Cannon's printed statement on checks is evidence of their own intent to be partners but is not evidence that Westside expressed an intent to be partners. *See Hoss v. Alardin*, 338 S.W.3d 635, 644 (Tex. App.-Dallas 2011, no pet.) ("Moreover, 'there must be evidence that *both* parties expressed their intent to be partners.'") (quoting *Ingram*, 288 S.W.3d at 900) (emphasis added in *Hoss*). There is no evidence that Westside acknowledged, or even noticed, this statement on the checks. To the contrary, King, Owens, Cannon, and Messer each testified that King told the other members of the foursome that Westside had no intention of being partners with anyone. The evidence is that King was emphatic about Westside not wanting to be in a partnership.

Similarly, Owens's testimony that he considered the group to be "loose partners" is no evidence of an expression of intent to be partners by Westside. *See Hoss*, 338 S.W.3d at 644. Additionally, his testimony cuts against the existence of a partnership by indicating that the group did not bear equal responsibility for SAFEClear services because he and King, alone, were responsible to the city. He further explained his answer by stating that the parties "operated as four different companies." Finally, Owens, like King,

testified that he did not understand the foursome to have formed a partnership.

Owens's draft partnership agreement does not constitute evidence of an expression of intent to be partners for two reasons. First, King rejected the agreement, announcing that Westside did not want to be partners with anyone. Second, the draft partnership agreement would have created a partnership only between Westside and Corporate Auto. Skafi's and Cannon's companies were not included as parties to the draft agreement. The trial testimony was their companies were to be subcontractors under the agreement, which limited subcontractors' rights to "participation in the daily operation of towing and recovery partnership" and stated that they had "no financial rights, interest, or claim to the Major Freeways Towing Agreement or its segments awarded by the City of Houston to Corporate Auto [ ] and Westside [ ]."

Skafi's testimony that the group's discussions of shared expenses, participation, and responsibility constituted discussion of a partnership is relevant to show whether the parties shared expenses or control but not to whether the parties expressed an intent to be partners. As the Supreme Court of Texas has observed, "[E]vidence of profit or loss sharing, control, or contribution of money or property should not be considered evidence of an expression of intent to be partners. Otherwise, all evidence could be an 'expression' of the parties' intent, making the intent factor a catch-all for evidence of any of the factors, and the separate 'expression of intent' inquiry would be eviscerated." *Ingram*, 288 S.W.3d at 900.

■■■ Cannon's testimony that they had an agreement for a four-way partnership and that King referred to them as partners is undercut by two considerations. First, a reasonable fact finder could not give weight to Cannon's testimony that their agreement was to form a partnership without additional evidence as to the basis of his conclusion. A lay witness's conclusion as to whether or not a partnership has been formed is not competent evidence of the formation of a partnership. *See Hoss*, 338 S.W.3d at 644–45 (*citing Ben Fitzgerald Realty Co. v. Muller*, 846 S.W.2d 110, 121 (Tex.App.-Tyler 1993, writ denied)); *see also Torres v. Kelley*, No. 13–04–00313–CV, 2007 WL 528849, at *3 (Tex. App.-Corpus Christi Feb. 22, 2007, no pet.) (mem. op.)). Cannon's testimony is legally competent evidence of his own understanding of the agreement. But it is not evidence of the other parties' understanding. There is no evidence that King stated at that meeting that Westside intended to form a partnership, or even that Cannon stated such an intent and King remained silent.[17] Without the factual basis for Cannon's conclusion that the group had formed a partnership, Cannon's conclusory opinion is not evidence that King expressed an intent to be partners. *See Hoss*, 338 S.W.3d at 644–45 (holding that

---

**17.** To the contrary, Owens testified that no one used the word "partner" at that meeting or in any group discussions before he drafted a proposed partnership agreement. King likewise testified that no one used the word "partnership" before Owens brought his draft agreement to the group. Messer, who was also present at the group's initial meetings, testified that no one mentioned the term "partnership" before Owens brought his proposed partnership agreement to a meeting.

Owens testified that, when he drew up a proposed partnership agreement, he made only Corporate Auto and Westside partners and brought the agreement to Westside alone because he felt that Skafi and Cannon were subcontractors who should not be included in the discussions. And, as noted above, King rejected Owens's proposed partnership agreement, informing all four parties that Westside would not form a partnership with any other party.

plaintiff's testimony that he and defendant "specifically agree[d] to be partners" was conclusory and therefore no evidence of an expression of intent to be partners under TRPA); *Torres*, 2007 WL 528849, at *3 (analyzing the existence of a partnership under TRPA and stating, "While it is true that both parties and their attorneys made numerous statements about a partnership to be formed, such conclusory statements are no evidence of the formation of a partnership contract. Mere personal belief there may be a partnership is not probative evidence.").

Second, King's alleged identification of Skafi and Cannon as partners at a SAFE-Clear operator's meeting is not necessarily indicative of an intent to be partners in the legal sense. The testimony indicates that King and Owens referred to Skafi and Cannon as partners in order that Skafi and Cannon would be allowed to attend a SA-FEClear operator's meeting with them. Courts have consistently held that "merely referring to another person as 'partner' in a situation where the recipient of the message would not expect the declarant to make a statement of legal significance is not enough." *Ingram*, 288 S.W.3d at 900; *see also Hoss*, 338 S.W.3d at 644–45; *AIG Risk Mgmt. Inc. v. Motel 6 Operating L.P.*, 960 S.W.2d 301, 307 (Tex.App.-Corpus Christi 1997, no pet.) (holding that letter in which AIG offered to work with Motel 6 in "partnership" to achieve Motel 6's risk management objectives did not suggest offer to form legal partnership but, rather, emphasized AIG's willingness and interest in working cooperatively with Motel 6). This is because the term "partner" is regularly used in common vernacular and may be used in a variety of ways. *Ingram*, 288 S.W.3d at 900. We must look to the words used, the context in which the statement was made, and the identity of the speaker to determine if such a statement constitutes legally significant evidence of an expression of intent. *Id.*

In *Ingram*, the Court found that Deere's testimony that Ingram represented that "this was a joint venture, or that we were partners, or we were doing this together" constituted no evidence that Ingram expressed an intent to be partners. *Id.* at 901. The Court observed that Deere did not have an accurate understanding of the legal meaning of a partnership and that the other evidence did not indicate an expression of intent: the business did not change its name to identify Deere as a partner; Deere did not sign the business's lease, was not named on the business's bank account, never signed a signature card for the bank account, and never filed taxes representing that he was a co-owner of the clinic; and Deere maintained his own insurance. *Id.*

Here too, none of four towing businesses changed their name to reference each other, nor did any party register an assumed name so that they could "do business as" the partnership. To the contrary, Cannon testified that Westside could not "do business as" the partnership. Westside, not any alleged partnership entity, was the sole party to its SAFEClear contracts with the city. The parties did not share a bank account or have signatory authority on each other's bank account. No party filed a partnership return for the alleged partnership between the foursome. Finally, each party maintained only separate insurance for their own business. For the same reasons articulated by the Court in *Ingram*, we conclude that there was no evidence of an expression of intent to be partners. *See Ingram*, 288 S.W.3d at 900–901; *see also Hoss*, 338 S.W.3d at 645 (holding that there was no evidence of expression of intent when one party identified the other as a "partner" to customers but there was no evidence as to why that

showed an expectation that the term carried legal significance); *DeNucci v. Moretti*, No. 03–98–00114–CV, 1999 WL 250141, at *6 (Tex.App.-Austin Apr. 29, 1999), *dism'd after settlement*, No. 03–98–00114–CV, 1999 WL 603589 (Tex.App.-Austin Aug. 12, 1999, no pet.) (stating that "although DeNucci admitted to referring to Moretti as his "partner" numerous times, mere legal conclusions by a lay witness do not prove the existence of a partnership.") (mem. op., not designated for publication).

This factor also suggests that the parties did not form a partnership.

### 3. Sharing control of business

 As noted above, sharing of control, like sharing of profits, is typically given particular importance in the analysis of whether a partnership exists. *See Ingram*, 288 S.W.3d at 896; *Big Easy Cajun*, 293 S.W.3d at 348. The trial testimony of all four purported partners was that each party ran its own business. Owens testified that the parties "operated as four different companies." Cannon testified, "Mr. King ran Westside Wrecker Service, and Mr. Owens run his. I run mine, as I always have, M[s]. Skafi run hers. This was only for a freeway deal. He handled his own drivers, trucks[;] I handled mine." Skafi testified she ran her towing business after her husband fell ill in 2005 and that, when King and Messer approached her and suggested that Messer take control over her operations, she objected that she did not want a "drill sergeant" running her drivers. Owens also testified that none of the four parties had any ability to act on behalf of or bind the others.

Although Messer handled a number of tasks that were performed for the benefit of all four tow companies with respect to the SAFEClear segments, a shared employee is not the same as shared control. The right to control a business is the right to make executive decisions. *See Ingram*,

288 S.W.3d at 901–02; *Tierra Sol Joint Venture v. City of El Paso*, 155 S.W.3d 503, 508 (Tex.App.-El Paso 2004, pet. denied); *Price v. Wrather*, 443 S.W.2d 348, 351–52 (Tex.Civ.App.-Dallas 1969, writ ref'd n.r.e.); *Guerrero v. Salinas*, No. 13–05–323–CV, 2006 WL 2294578, at *11 (Tex. App.-Corpus Christi Aug. 10, 2006, no pet.) (mem. op.). There is no evidence that any of the parties had any right to make executive decisions that extended beyond the operation of their own individual company. *See Ingram*, 288 S.W.3d at 901–02; *Hoss*, 338 S.W.3d at 645–46 (holding that exercise of control over some subordinate employees was no evidence of right of control over business operations); *Big Easy Cajun*, 293 S.W.3d at 349 (holding that there was no evidence of shared control when one party provided administrative services to the other); *Knowles v. Wright*, 288 S.W.3d 136, 147 (Tex.App.-Houston [1st Dist.] 2009, pet. denied) (concluding that testimony that parties sometimes made decisions together was no evidence of control when one party had no ability to control decisions or actions of other party's business decisions).

Skafi and Cannon also rely on Cannon's testimony that the parties intended to work out their differences democratically:

> Q. And as far as running the meetings of the group of four, was this a [d]emocratic process? Was it supposed to be a [d]emocratic process?
>
> A. It was supposed to be, and it tried to be. Sometimes it was more of a yelling match; but all in all, we were able to work out most of our differences.

Even reading this testimony as supporting a contention that the parties attempted to run group meetings democratically, there is no evidence that the group ever made any executive decision about the operation

of the four towing companies in such a manner. *See Ingram*, 288 at 901–02. Here again, the evidence indicates that parties attempted to work together as separate business entities seeking to share in a particular, mutually-beneficial business opportunity but did not work together to exercise shared control over a single, united partnership entity or over each others' individual business entities.

This factor suggests the absence of a partnership.

### 4. Sharing losses or liability

 The evidence demonstrates that the parties did not share losses or liability. When asked whether he might share any liability for Westside's drivers, Cannon testified, "We never had that kind of agreement." He further stated that their agreement was not the kind of agreement where Westside could be doing business in the name of their alleged partnership. Owens also testified that the parties did not share liabilities. King likewise testified that the parties never shared losses or liabilities for debts. And each party maintained its own separate liability insurance. While the parties shared certain expenses, sharing specific expenses is not evidence of sharing losses or liabilities. *See Ingram*, 288 S.W.3d at 902 (holding that sharing of revenue and contribution of specific portion of revenue to expenses was not evidence of shared losses when party had no liability for losses in excess of predetermined contribution to expenses).

This factor does not support the existence of a partnership.

### 5. Contributing money or property to the business

 Skafi and Cannon rely on their sharing SAFEClear expenses as evidence that they contributed money or property to the business. They also note that the four companies' equipment and assets were identified in the SAFEClear bid packages.

While the sharing of these expenses is consistent with a partnership between the parties, it is equally consistent with the possibility that the four towing companies agreed to share the cost of obtaining a particular business opportunity—participation in the SAFEClear program—in which they would all participate equally, but as individual companies. *Cf. Smith v. Deneve*, 285 S.W.3d 904, 915 (Tex.App.-Dallas 2009, no pet.) (holding that evidence that party made contributions toward mortgage payment on house was not evidence that he contributed to partnership to buy, fix-up and sell house for profit when he was also living in house and mortgage payment was equally consistent with conclusion that other party owned house and he paid rent); *Resendez v. Maloney*, No. 01-08-00954-CV, 2010 WL 5395674, at *7 (Tex.App.-Houston [1st Dist.] Dec. 30, 2010, pet. denied) (mem. op.) (holding that plaintiff failed to satisfy partial performance as exception to statute of frauds bar against alleged ten-year partnership agreement because evidence of companies working together on twenty-three prior events was equally consistent with companies merely working together without partnership agreement). Additionally, sharing in expenses does not necessarily constitute contributing money or property to a partnership. For example, in *Ingram*, the evidence showed that the party claiming a partnership had agreed to have a certain amount deducted from his share of the organization's revenues to cover expenses, but that evidence was not discussed with respect to contribution, of which the Texas Supreme Court concluded there was no evidence. *See Ingram*, 288 S.W.3d at 899, 902–03.

The payments made by Skafi's and Cannon's towing companies were not made to

an alleged partnership entity; they were made to Westside and Corporate Auto. The checks expressly noted, however, that they were issued "as partner in City of Houston Major Freeway Tow Agreement." We conclude that this is some evidence that Skafi and Cannon contributed money to the alleged partnership by issuing payments of SAFEClear fees purportedly made on behalf of the partnership.

Like the shared expenses, the listing of all four towing companies' assets on the SAFEClear bids is equally consistent with the possibility that four separate companies were working together to obtain a business opportunity in which they might each partake. There is no evidence that the parties transferred ownership or any interest in their individual assets to a partnership entity or that any of the four towing companies had a right to possess or use assets belonging to one of the others.

Under this factor alone, there is some evidence of a partnership.

### 6. Conclusion

 TRPA defines a partnership as "an association of two or more persons to carry on a business for profit as owners." TRPA art. 6132b–2.02(a); *Ingram,* 288 S.W.3d at 894; *see also* Tex. Bus. Org.Code Ann. § 152.051(b). But the parties did not associate for the purpose of carrying on a single business in which they each held an ownership interest; instead, the four separate businesses agreed to work together for their mutual, but individually realized, benefit. Such coordinated business efforts do not, alone, create a partnership under Texas law. *See Ingram,* 288 S.W.3d at 894; *see also* Tex. Bus. Org.Code Ann. § 152.056 ("A partnership is an entity district from its partners."). The parties did not share profits, losses, or liabilities. Although the parties shared an employee, each party maintained exclusive control over his or her own business operations.

There is no evidence that King or any other representative of Westside ever expressed an intent to be partners with Skafi and Cannon; instead, there is uncontested evidence that King told the others that Westside would not form a partnership with anyone. There is, however, some evidence that Skafi and Cannon contributed money to the alleged partnership.

Considering this evidence in its totality, we conclude that the evidence is not legally sufficient to support the jury's finding that Westside created a partnership with Skafi and Cannon. *See Ingram,* 288 S.W.3d at 899–904 (applying totality-of-the-circumstances test); *see also Hoss,* 338 S.W.3d at 650 (holding that evidence was legally insufficient to support partnership finding when there was no evidence of four out of five TRPA factors and only weak evidence on the fifth factor); *Big Easy Cajun,* 293 S.W.3d at 349 (applying totality-of-the-circumstances test to determine that there was no evidence to support existence of a partnership). This conclusion negates the predicate for Skafi's and Cannon's claims for breach of fiduciary duty and breach of the duties of care and loyalty. *See Hoss,* 338 S.W.3d at 650 ("Our conclusion that the jury's finding of a partnership between Hoss and Alardin was supported by legally insufficient evidence negates the predicate for Alardin's recovery for breach of fiduciary duty, so we need not consider Hoss's remaining issues on appeal."). We therefore hold that the trial court properly disregarded the jury's answers to questions eight (partnership), nine (duty of loyalty), ten (duty of care), eleven (Skafi's breach of duty of care and loyalty damages), twelve (fiduciary duty), thirteen (Skafi's breach of fiduciary duty damages), fourteen and fifteen (mitigation of Skafi's damages).

Because we conclude that there is not legally sufficient evidence to support the

jury's determination that Westside created a partnership with Skafi and Cannon, we do not reach Skafi and Cannon's contention that a partnership can be formed by conduct in the absence of an agreement when such an agreement would be barred by the statute of frauds. *Cf. Carpenter,* —— S.W.3d at —— (when agreement concerning real property was barred by statute of frauds, there was no basis for partnership between parties to develop the real property).

## B. Exemplary damages

Although Skafi and Cannon assert that the trial court erred in disregarding the jury's answers to the questions on exemplary damages (questions sixteen, seventeen, nineteen, and twenty), they make no argument specific to exemplary damages. The implication is that if the partnership finding is reinstated, so too must the exemplary findings be reinstated.[18] We have held that the trial court properly disregarded the jury's partnership finding. A party may not recover exemplary damages unless the party also recovers actual damages on a claim for which exemplary damages are available. *Jim Walter Homes, Inc. v. Reed,* 711 S.W.2d 617, 618 (Tex. 1986); *El-Khoury v. Kheir,* 241 S.W.3d 82, 89 (Tex.App.-Houston [1st Dist.] 2007, pet. denied). Because neither Skafi nor Cannon are entitled to recover actual damages, they are not entitled to recover exemplary damages. *See El-Khoury,* 241 S.W.3d at 89.

We overrule Skafi and Cannon's fourth issue.[19]

## Conclusion

The trial court erred in awarding Skafi and Cannon damages for unpaid towing or storage because the alleged agreement creating liability for those damages is unenforceable under the statute of frauds. The trial court properly disregarded the jury's partnership-related findings because the evidence is not legally sufficient to support the existence of a partnership between Westside and Skafi or Cannon. We reverse the trial court's judgment with respect to Westside and enter judgment that Skafi and Cannon take nothing on their claims against Westside.

---

18. Even if Skafi and Cannon had prevailed on their contractual claims, exemplary damages are not available for breach of contract. *See Tony Gullo Motors I, L.P. v. Chapa,* 212 S.W.3d 299, 304 (Tex.2006).

19. Because of our holding on this issue, we need not reach Skafi and Cannon's fifth issue, requesting remand in the event the partnership finding were reinstated.