**Opinion issued October 29, 2024**



**In The**

# Court of Appeals

**For The**

# First District of Texas

———————————

**NO. 01-22-00798-CV**

———————————

**AMERICAN JEREH INTERNATIONAL CORP., Appellant**

**V.**

**RONALD CLARKE, Appellee**

---

**On Appeal from the 61st District Court**
**Harris County, Texas**
**Trial Court Case No. 2020-68829**

---

## MEMORANDUM OPINION

Appellant, American Jereh International Corp. ("American Jereh"), challenges the trial court's judgment rendered, after a jury trial, in favor of appellee, Ronald Clarke, in Clarke's suit against American Jereh for breach of contract, promissory estoppel, and quantum meruit. In three issues, American Jereh contends

that the trial court erred in rendering judgment in favor of Clarke on his breach-of-contract claim.

We reverse and remand.

## Background

In his second amended petition, Clarke alleged that American Jereh was "a global developer and manufacturer of high-end petroleum equipment." According to Clarke, he was well-known to American Jereh as well as "Jereh Global," Yantai Jereh Petroleum Equipment & Technologies Co., Ltd. ("Yantai Jereh"), and other associated businesses.

Clarke further alleged that in 2017, American Jereh wanted to enter business discussions with BJ Services, LLC ("BJ Services"), a Houston, Texas "based oilfield fracturing services provider, to negotiate the sale of fracturing equipment produced by [Yantai Jereh] to BJ Services." But American Jereh had been unsuccessful in its attempts to contact BJ services to engage in business discussions. Thus, in February 2017, American Jereh hired Clarke as a consultant "to assist in making contact with BJ [S]ervices and develop[ing] a business relationship." As consideration for his services, American Jereh promised Clarke a five percent commission "on sales if an agreement was entered into to purchase" equipment.

According to Clarke, he initiated discussions with BJ Services on behalf of American Jereh "by using his professional relationships, wealth of experience in the

2

industry and personal contacts." "After garnering the interest of BJ Services, Clarke provided [American] Jereh with valuable business consultant services and advice, including professional strategic information and how to best negotiate a business collaboration agreement with BJ Servicers." Further, Clarke arranged a meeting between American Jereh and top-level members of BJ Services. Clarke alleged that as a direct result of his consultant services, a business relationship was formed between American Jereh and BJ Services and "a significant contract was signed between the parties." Specifically, American Jereh entered into an agreement with BJ Energy Solutions, LLC and was paid at least $24 million "from the efforts of Clarke's consulting services." Yet, American Jereh did not compensate Clarke as it had agreed to do.

Clarke brought claims against American Jereh for breach of contract, promissory estoppel, and quantum meruit. As to his breach-of-contract claim, Clarke alleged that he and American Jereh had entered into a valid and enforceable agreement, he performed his obligations under the agreement, American Jereh breached the agreement by failing to compensate him for his consulting services, and the breach caused significant injury to him. Clarke requested actual damages, attorney's fees, and pre- and post-judgment interest.

American Jereh answered, generally denying the allegations in Clarke's petition and asserting certain defenses, including the statute of frauds.

At trial, Clarke testified that he was in independent international business consultant. While working as a consultant, Clarke did not always sign written agreements with the clients for whom he was providing services.

According to Clarke, in 2013, he was approached by Jason Gao, who told him that the Jereh Group, the parent company of American Jereh and Jason Oil & Gas, as well as others, wanted to build a factory in Yantai, China "to make coil tubing, steel coil tubing products."[1] Related to that project of "putting [a] factory in place," Clarke signed a consulting agreement on May 8, 2013 (the "May 8, 2013 agreement")[2] with Jason Oil & Gas, a wholly-owned subsidiary of the Jereh Group. The May 8, 2013 agreement provided that Jason Oil & Gas would pay Clarke $250,000 for his services, which were specified in the agreement, according to a certain fee structure, which was also specified in the agreement. The term of the May 8, 2013 agreement was three years, and the agreement specified the points in time when Clarke would be paid. The May 8, 2013 agreement did not provide that Clarke would be paid a commission because it was not a contract where he was "selling product that [he] would earn commission on."[3]

---

[1]     According to Clarke, Gao was the manager of Jason Oil & Gas.

[2]     A copy of the May 8, 2013 agreement was admitted into evidence at trial.

[3]     Clarke noted that he had four written contracts with Jason Oil & Gas and all agreements were required to be in writing.

4

Clarke further testified that in 2014, Gao introduced him to Chengcheng Yu, who Clarke believed was a manager at American Jereh.[4] Clarke met Yu at an office on Miller Road in Houston.[5] Later, Clarke met with Yu in China after she asked him to visit with the chairman of Jereh Group. The chairman asked Clarke to "use [his] influence" to help the company "get back in [the] good graces" of certain professional organizations. Clarke agreed to do so voluntarily and without payment.

The chairman also told Clarke: "You go around the world, if you see opportunities, let us know." And Clarke told him that he knew about an opportunity with a company in Russia. Clarke said: "Let me go talk to them and see if they're interested in the equipment." The chairman told Yu to put "something together" and told Clarke that he was "in charge of it" and would be paid a commission. Yu then, in 2014, prepared an agreement, which was never signed. That agreement, titled "Cooperation Agreement" (the "2014 Cooperation Agreement"),[6] was to be between Clarke and Yantai Jereh. It described Yantai Jereh as "a worldwide supplier in providing integrated solutions of oilfield equipment and services for oil and gas drilling, well intervention, well completion, natural gas transportation, natural gas

---

[4]    Clarke stated that he always believed that Yu was a "senior person at American Jereh" even though "[t]here were several different iterations of her position from time to time."

[5]    Clarke testified that the sign outside of the Miller Road office said "Jereh."

[6]    A copy of the 2014 Cooperation Agreement was admitted into evidence at trial.

liquefaction, [and] environmental management to the oil and gas industry" and stated that Clarke would assist Yantai Jereh in establishing business relationships with customers and supplying equipment to customers. The 2014 Cooperation Agreement also listed Yantai Jereh's and Clarke's respective obligations. Notably, if Yantai Jereh was "successfully awarded" a contract "through [a] bid or direct negotiation with [the] direct assistance" of Clarke and a contract was "formally signed," then Clarke was to receive a three percent commission "of the contract value." Clarke's commission would be due and payable within fifteen days of the day on which Yantai Jereh received payment from its customer. The 2014 Cooperation Agreement stated that it would be valid for three years.

Clarke stated that he received the 2014 Cooperation Agreement from Yu, although it was not signed. Clarke was not involved in the preparation of the 2014 Cooperation Agreement, but he reviewed it. Clarke and Yu agreed that he would receive a three percent commission. According to Clarke, Yu was designated by the chairman to be his "go-to person for anything related to the[] business," and Clark believed that Yu had the authority to enter into agreements with him and negotiate with him about his commission. Clarke testified that going forward, in his dealings with the Jereh Group, the 2014 Cooperation Agreement became a "template," but it might have been amended or changed "here or there."

In November 2016, Clarke informed Yu of an opportunity in Ukraine with a company that "was going to put a bid out for [thirty] drilling rigs." Clarke sent Yu an email asking if she had heard about the opportunity. Clarke also informed Yu that they "need[ed] an agreement in place . . . before [he] d[id] any more work," because he did not want to be "cut . . . out." In response to Clark's email, Yu told Clarke that the Jereh Group was already aware of the opportunity.

Clarke further testified that in November 2016, Yu was "representing her position" to be the regional director for Jereh Group USA, and her office was still located on Miller Road in Houston. Clarke believed that Jereh Group USA was "American Jereh" and that Yu primarily worked in Houston.

As to his breach-of-contract claim, Clarke explained that he had an oral agreement with American Jereh. According to Clarke, in January 2017, he met with Yu at the Miller Road office. Yu told Clarke: "I need help. I need help to introduce our product to BJ Services and hopefully others, but BJ Services in particular, because we cannot even get a phone call returned, e-mail returned, a meeting, nothing. It's as if we don't exist. Can you help me?" Clarke told Yu that he could help, but he said that he would need a few days to think about "the best way forward."

Clarke testified that he knew that the chief executive officer ("CEO") for BJ Services "had a run-in with Jereh in Canada the previous year" and the CEO "had a

7

negative perception of Jereh." Thus, Clarke could not simply call BJ Services's CEO and say: "[L]et's get together" and "[t]alk about this." Instead, Clarke got in touch with Marc Allcorn, a senior executive at BJ Services, to talk about "the possibilities of . . . establishing some kind of relationship" so that products could be sold to BJ Services. Clarke believed that there were two opportunities to take advantage of: (1) American Jereh could "collaborate in repairing and maintaining [BJ Services's] existing equipment" and (2) American Jereh could provide BJ Services with "new technology." After Allcorn thought about it, at the beginning of February 2017, he called Clarke and suggested a dinner with executives from both companies.

On February 3, 2017, Clarke emailed Yu suggesting a "dinner with BJ people" the following week. In his email, Clarke asked what the "arrangement" for his commission would be because he and Yu needed to "come to some agreement on that." When Clarke did not hear back from Yu, he emailed her again on February 4, 2017, explaining that if they could "make a deal together" then he would set up the meeting with BJ Services for February 8, 2017. On February 7, 2017, Clarke sent Yu another email, with the subject line: "Draft Agreement." In the email, Clarke stated: "Please see attached. It is a draft and you can make [a] counter proposal." Clarke testified that he had "cut and paste[d]" the 2017 proposed draft agreement from the 2014 Cooperation Agreement but suggested that he receive a five percent

8

commission[7] this time. Otherwise, Clarke's 2017 proposed draft agreement was identical to the 2014 Cooperation Agreement that Yu had sent him, "[e]xcept for the appendix." According to Clarke, he sent the 2017 proposed draft agreement "to remind [Yu] of how [they had been] doing things." As far as Clarke was concerned though, "an agreement was in place," just "the commission rate had to be agreed to" as well as "a few [other] things" like what law applied and the name of the company Clarke was signing the agreement with.[8] Appendix A of the 2017 proposed draft agreement listed "BJ Services, Tomball, Texas USA" as "Customers and/or Projects." Clarke noted that he never got a response to his 2017 proposed draft agreement.

Before the dinner on February 8, 2017, Yu sent Clarke an email thanking him for organizing the dinner with BJ Services and indicating who would be attending on behalf of her company. In her email, Yu listed herself as both the "Regional Director of Jereh North America" and as the "Regional Director" of "Jereh Group-USA." Clarke testified that he believed that Jereh North America was the same as American Jereh, but he also stated that Yu never told him that she worked

---

[7] Clarke testified that a five percent commission was reasonable.

[8] In contrast, Clarke also testified that the 2017 proposed draft agreement was a "template for an agreement" and "some changes" may have been required. He also stated that he had no written agreement with American Jereh related to his consultation efforts regarding BJ Services. And the 2017 proposed draft agreement was "a proposal." Further, according to Clarke, American Jereh was not listed as a party to the 2017 proposed draft agreement.

for American Jereh, However, based on Yu's email, Clarke also believed that Yu was bringing "top level people on behalf of American Jereh to" the dinner with BJ Services.

On February 8, 2017, Clarke and Yu exchanged emails, with Clarke providing Yu with the seating arrangement and stating: "If we are to be successful with BJ [Services] we need to offer some kind of partnership. This could involve stocking parts at agreed levels or some other way to support each other."[9] Clarke sent Yu another email on February 8, 2017, before the dinner, discussing his strategy for American Jereh's business going forward. He testified that this email was a portion of his consulting work in which he was advising American Jereh on how to establish a relationship with BJ Services.[10]

Clarke further testified that the dinner took place on February 8, 2017. Landon Vredeveld, director of operations support, Allcorn, director of learning and knowledge management, Tony Yeung, manager of engineering, and Andres Alvarez, manager of electronics and controls, attended on behalf of BJ Services. The dinner lasted about two and a half hours. According to Clarke, Yu was "most interested" in speaking with the individuals from BJ Services "because she was

---

[9] Clarke testified that he believed this email communication was part of the consulting services he was providing to American Jereh.

[10] But Clarke also testified that he did not expect to get paid for any work he did between January 2017 and the dinner on February 8, 2017.

10

responsible for American Jereh" and American Jereh "was going to be making the products or supplying the products through their Yantai operation."

At the end of the dinner, when everyone was "kind of dispersing" and "saying [their] goodbyes," Clarke said to Yu: "Are you good with [five] percent?"  And Yu responded: "Yes, I'm good."  They did not discuss anything else or any other terms of an agreement that night though.[11]  Based on Yu's statements, Clarke believed that they had a finalized oral agreement.  According to Clarke, February 8, 2017 was the date that he and American Jereh entered into an oral agreement, although the only term they had agreed to that night was his five percent commission.[12]  Clarke admitted that Yu, in her deposition testimony, did not agree that there was an oral agreement with Clarke on February 8, 2017.[13]

After the February 8, 2017 dinner, Clarke spoke with Allcorn, who stated that BJ Services was "pretty impressed" and "wanted to know more."  According to Allcorn, BJ Services wished "to follow up with some more information."  Yu also

---

[11]  As Clarke explained, he was "not going to sit down and go through a contract in a parking lot."

[12]  Clarke also testified that the oral agreement made on February 8, 2017 was for a "[five] percent commission" and the rest of the agreement was "pre-ordained."  And according to Clarke, Yu knew the rest of the agreement was "in line" with the 2014 Cooperation Agreement.

[13]  According to Clarke, under the oral agreement, he was responsible for "introduc[ing] and warm[ing] up and de-ic[ing] the relationship . . . with the intent of supplying equipment."

11

felt that the dinner went well. Clarke explained that the ultimate goal was for "an environment [to develop] where Jereh would be able to sell its products to BJ Services." Clarke felt that after the dinner American Jereh and BJ Services could enter an agreement regarding the purchase of equipment within twelve months. He expected that a contract between BJ Services and American Jereh could be negotiated in a couple of months, and that he could be paid for his consulting services within nine or ten months or that it would take less than a year for American Jereh to pay him.

On February 9, 2017, Clarke sent an email to Yu providing his opinion and seeking to "reinforce[] . . . that simple transactions between a buyer and [a] seller . . . ha[d] come to an end." Clarke hoped that Yu would find his opinions helpful. In response, on February 13, 2017, Yu sent Clarke an email thanking him for "arranging the meeting between Jereh and BJ [Services]." She also informed Clarke that she was "working on" his consulting agreement, but she needed to speak with Max Liu[14] and she would have to "get . . . back" to him about a consulting agreement. Clarke believed this to mean that Yu would "just inform" Liu about the oral agreement that he and Yu had purportedly finalized at the end of the dinner on

---

[14]   Clarke stated that Liu became the president of American Jereh in March 2017. Yu later testified that in February 2017, Liu was the president of Jereh North America.

12

February 8, 2017.[15] According to Clarke, he and the Jereh Group did not typically sign written agreements when he provided consulting services.

As to the relationship that formed between BJ Services and, as Clarke alleged, American Jereh, Clarke stated that he believed that "everything stemmed from th[e] first de-icing or warm-up meeting" in February 2017 that he had organized. Clarke testified that on November 20, 2019, more than two years later, "BJ Services and American Jereh entered into a sales contract" (the "November 2019 sales contract"). Under the November 2019 sales contract, BJ Services agreed to pay American Jereh $24 million. In Clarke's opinion, this was a "tremendous contract for Jereh" and "a huge, huge breakthrough into the US market." Clarke became aware that a contract had been formed between American Jereh and BJ Services because "[t]here were several newspaper articles, magazine articles, statements from BJ Services, press relations, things like th[at]." Clarke noted that he had no direct role in "any of the negotiations about the specific contents of" the November 2019 sales contract but stated that his "involvement was setting the ball rolling" in 2017. He did not know about the November 2019 sales contract until he read about it. Clarke acknowledged that it was American Jereh's position that the November 2019 sales contract was initiated by "a third-party consultant named Lyoid Fussell."

---

[15]    Clarke testified that in his opinion Yu had more authority than Liu.

13

A copy of the November 2019 sales contract was admitted into evidence. It stated that it was between Yantai Jereh, "for itself and on behalf of American Jereh," and BJ Services. Under sale contract, BJ Services agreed to buy a "[f]leet" from Yantai Jereh and American Jereh for $24 million.[16] The November 2019 sales contract was signed by the president and CEO of BJ Services, Liu, the president of American Jereh, and by the second vice president of Yantai Jereh. Clarke testified that BJ Services paid American Jereh $25.6 million pursuant to the November 2019 sales contract. Clarke believed that he was owed $1.26 million based on the November 2019 sales contract amount, and he had expected to receive that money fifteen days after American Jereh was paid.

On September 15, 2020, Clarke sent an email to Yu, stating that he was "delighted to hear that, as a result of the meeting [he had] arranged between Jereh and BJ [Services], there ha[d] . . . been a large volume of equipment delivered to the USA." Clarke requested "payment of the 5% commission" that he believed he was owed from American Jereh. Clarke did not receive a response to his September 15, 2020 email. On September 17, 2020, Clarke sent Yu another email, stating: "Can you please confirm you received my e-mail of 15th September? . . . I am anxious to cement our financial arrangements regarding the equipment developed as a result of the relationship started at the dinner meeting in Houston some time ago with BJ

---

[16] According to Clarke, this amount was amended to $25.6 million.

[Services]."  At trial, Clarke explained that he meant that they needed to "figure out how th[e] money [was] going to change hands; which banks [were] going to [be] use[d]; who[] [was] going to do it; [was] it going to come from China; [was] it going to come from America."

On September 18, 2020, Clarke received an email from Liu, asking Clarke to provide the agreement he had mentioned in his emails to Yu.  Liu also stated:  "At that dinner, I remembered mentioning the business of transforming BJ's old equipment.  After that dinner, for nearly two years, we and BJ [Services] never had any business dealings.  We did not have any relationship established.  My judgment was BJ [Services] denied us. . . . [W]e did not even have the opportunity to talk about th[e] business again."  Liu signed the email as the president of Jereh Global North America.

In summation, Clarke testified that he had an oral agreement with American Jereh, and Yu had agreed to pay him a "[five] percent commission" of "sales" at the February 8, 2017 dinner with BJ Services.  Although Clarke also noted that the definition of "sales" was not discussed on February 8, 2017, he thought he and Yu both understood "that it was invoice sales."  The payment period was also not discussed on February 8, 2017.  "The specific thing [that they] discussed at the dinner was the commission."

15

According to Clarke, American Jereh ultimately did not compensate him for his consulting services, which he thought were valuable services because the November 2019 sales contract with BJ services "changed [the] landscape of [American Jereh's] business in the United States." Clarke had expected to receive five percent of American Jereh's "revenues," and he believed that American Jereh had benefitted from his services. However, Clarke noted that he did not have any direct involvement "with any business between any Jereh entity and BJ Services" after March 2017. Clarke never had a written agreement with American Jereh.

Allcorn testified that he began working at BJ Services in November 2016 as the integration project manager; and according to Allcorn, he was a leader and an investor at BJ Services. After moving out of the integration project manager role, Allcorn became the director of learning and development, which allowed him to be involved in all leadership meetings.

Allcorn noted that he dealt with Clarke "remotely" in 1986 or 1987, and he met Clarke in person in 1988, while working at Schlumberger. At the time, Clarke had a lot of knowledge about coiled tubing, which was helpful to Allcorn. According to Allcorn, at the time of trial, he had known Clarke for about thirty-five years.

As to "Jereh,"[17] Allcorn explained that prior to January 2017, the CEO of BJ Services, Warren Zemiak, had "a bad taste in [his] mouth" about Jereh. In January 2017, Clarke contacted Allcorn by telephone, telling Allcorn that "he was representing Jereh and that they wanted to find a way to get access to the BJ [Services] decision-maker so that they could sell equipment to BJ Services." Clarke further stated that Jereh had been "unsuccessful in kind of doing that with anybody," and Clarke said that he would help. Clarke then asked Allcorn if he "could arrange a meeting for the Jereh people with BJ Services." Clarke spoke to Allcorn about how Jereh was "a wide[-]ranging manufacturer and that [it] had a lot of different things that [it] could do," and although Allcorn's role was "not in procurement, equipment selection or in the supply chain group," he was an "investor and . . . a leader" in BJ Services, and he thought "it was a great opportunity for [BJ Services] to make sure that [it] gave Jereh a . . . very good look." Clarke told Allcorn that he had a contract with Jereh, so Allcorn agreed to set up a meeting.[18] Allcorn noted that he spoke to Vredeveld, the head of manufacturing and sustaining, Yeung, an engineering manager, and Alvarez, a lead person for control systems, who all

---

[17] Allcorn testified that he only ever knew about the company named "Jereh"; he had not heard the name American Jereh before late 2020.

[18] Allcorn stated that he had no knowledge of a February 2017 oral agreement between Clarke and American Jereh.

17

worked at BJ Services, and then he coordinated with Clarke to set a date for a meeting with Jereh.

As to BJ Services's objective in meeting with Jereh, Allcorn explained that BJ Services wanted "to find out if Jereh could be a credible or viable supplier to BJ Services." Ultimately, Allcorn brought "key players from BJ [Services]" to a dinner on February 8, 2017 with what Allcorn believed "to be the leadership from Jereh." At the dinner, there were introductions and Vredeveld and Yeung were sat "in the best position to talk to the most senior person at Jereh." According to Allcorn, during the dinner, "there was a pitch . . . about what it was that Jereh could offer to BJ Services." Allcorn believed that the individuals representing Jereh at the dinner, including Yu, Liu, and Jili Wang, the Vice Board Chairman, President of Jereh Group, had the authority to negotiate a contract on behalf of Jereh. Allcorn also believed that Jereh and BJ Services "continued their discussions after" the February 8, 2017 dinner and that discussions occurred between BJ Services and Jereh in 2018 and 2019. But Allcorn felt that he "had done what [he] needed to do to put everybody together," so he only monitored the relationship at leadership meetings.

Allcorn further testified that ultimately BJ Services bought equipment from Jereh. According to Allcorn, he heard about "what [BJ Services was] doing with Jereh" at leadership meetings and he was asked to review a specific portion of the

November 2019 sales contract.  Under the November 2019 sales contract, BJ Services agreed to purchase "one fleet," and there were provisions in the contract to buy more.  Copies of 2020 and 2021 invoices from American Jereh to BJ Services were admitted into evidence at trial.  The invoices listed Yu's email address at Jereh and stated that they were from Yu.  It was Allcorn's understanding that BJ Services made payments to Jereh totally $25.6 million for the "fleet."

As to the February 8, 2017 dinner specifically, Allcorn stated that the November 2019 sales contract was "a result of the initial meeting that [BJ Services] had in February" 2017 with Jereh.  The dinner got BJ Services "to overcome th[e] hurdle of [its] CEO having a bad taste in his mouth" about Jereh.  And according to Allcorn, Clarke was the person "who initiated it all."  However, he also stated that Zemiak, the CEO of BJ Services, drove the negotiations of the November 2019 sales contract and he was not at the February 8, 2017 dinner.  Similarly, Dan Fu was involved in the negotiations of the November 2019 sales contract, and he was not at the February 8, 2017 dinner with Jereh.

Finally, Allcorn noted that in February 2017 he did not know that American Jereh existed as a company; he only knew of Jereh.  And none of the people at the meeting represented that they were from American Jereh.  Allcorn also noted that it took more than a year from the February 8, 2017 dinner for BJ Services to enter into the November 2019 sales contract with Jereh.

19

Yu testified that she began working for American Jereh in May 2022 and she did not work at American Jereh before then. American Jereh was an "oil field equipment manufacturer" and it "suppl[ied] . . . oil field equipment like fracking equipment for . . . oil field service companies." At American Jereh, Yu served as the key account director, and she worked out of the Miller Road office in Houston.

Yu further testified that she was not employed by American Jereh in 2017, and in 2017, she did not tell Clarke that she was employed by American Jereh. In 2017, Yu worked for Yantai Jereh, which operated out of China, as the regional director for North America.[19] Yantai Jereh was not the parent company of American Jereh; it did not own American Jereh, and it did not control American Jereh. According to Yu, in her role as regional director for North America, she was "in charge [of] selling the equipment to the customer . . . [in] the region [that she was] responsible for." Jereh North America was a division of Yantai Jereh. The offices for Yantai Jereh and Jereh North America were in China. However, if Yu needed to have a local meeting in the United States, she could borrow a meeting room at the Miller Road office.

As to Clarke, Yu explained that she met Clarke at an oil and gas show sometime before 2017. Later, she and Clarke talked about "what kind of companies

---

[19]     Yu explained that she worked at Yantai Jereh from September 2009 until April 2022.

he c[ould] help to approach" Yu could not recall whether she asked Clarke "for help with meeting BJ Services and selling . . . products." Yu also could not recall whether Clarke ever met with her at the Miller Road office. According to Yu, Clarke knew that she worked for Yantai Jereh.

As to the origination of the February 8, 2017 dinner, Yu stated that Clarke emailed her on February 2, 2017 and suggested having a dinner with representatives from BJ Services. Yu had not asked Clarke to set up a dinner with anyone from BJ Services, but she did want Clarke "to help [her] with BJ Services if he could." In his email, Clarke asked Yu: "[W]hat will our arrangement be regarding commission?" But Yu never responded to Clarke's question about a commission because she did not have "authorization to do so." According to Yu, she had previously told Clarke that there was an approval process before a commission could be agreed to and she could not make such an agreement on her own.

On February 3, 2017, Clarke again emailed Yu and told her: "[I]f we can make a deal together[,] we can have dinner with BJ [Services] on February 8th." Yu agreed to the dinner with BJ Services on February 8, 2017, but she explained that she did not agree to pay Clarke for just setting up the dinner. And if Clarke had demanded that she "pay [him]" in order to go to the dinner, she would not have agreed to that demand.

Yu also testified that on February 7, 2017, Clarke sent her a proposed draft of an agreement by email. The 2017 proposed draft agreement was between Clarke and Yantai Jereh, and it included "a whole list of things that . . . Clarke [was] proposing he would have to do to earn his commission." But Clarke did not complete anything on the list, and Yu did not expect him to because she had no agreement with him to do so. Yu noted that the 2017 proposed draft agreement did not include standard terms that Yu had agreed to in other agreements with Clarke. According to Yu, she did not respond to Clarke's February 7, 2017 email containing the 2017 proposed draft agreement before the dinner with BJ Services on February 8, 2017.

At the February 8, 2017 dinner, Yu and others spoke to the BJ Services representatives about Yantai Jereh's capabilities. But Yu did not receive any business cards from the BJ Services representatives. BJ Services did not seem "really interested in the capability [that Yantai Jereh] proposed." At the February 8, 2017 dinner, Yu did not discuss a consulting agreement with Clarke, and no one who worked for American Jereh attended the February 8, 2017 dinner.[20] Yu also testified that she did not negotiate a consulting agreement with Clarke after the dinner in the parking lot, and she did not discuss a five percent commission for any sales to BJ

---

[20] Yu explained that Liu, president of Jereh North America, Wang, vice board chairman of president of Jereh Group, and Sharq Li, a products manager, attended the February 8, 2017 dinner. No one from American Jereh attended the dinner.

22

Services on the night of February 8, 2017. At the time the February 8, 2017 dinner took place, American Jereh did not have any capability to "manufactur[e] a frac fleet."

Additionally, Yu stated that she never agreed on behalf of any entity to pay Clarke a five percent commission at any time. And she did not agree to pay on behalf of American Jereh or on behalf of Yantai Jereh to pay Clarke a five percent commission. According to Yu, she made no agreement with Clarke. After the February 8, 2017 dinner, Yu told Clarke that they had not reached an agreement and that she could not enter into a consulting agreement with him until she got her supervisor, Liu, involved.[21] Yu wanted to make sure Clarke knew that they did not have any agreement and that she needed Liu to make the final decision regarding a consulting agreement. Ultimately, Liu decided "not to go with . . . Clarke . . . for the consulting agreement," so Yu never returned the 2017 proposed draft agreement to Clarke. According to Yu, Clarke "made a proposal, Yantai Jereh . . . considered it, and just decided not to go into business with him." Yu did not hear from Clarke again about his 2017 proposed draft agreement or any agreement between her and Clarke until September 15, 2020.[22]

---

[21] Yu noted that Liu was president of Jereh North America, a part of Yantai Jereh, at the time and was her boss. According to Yu, Liu never worked for American Jereh.

[22] On September 17, 2020, Clarke emailed Yu stating that he was "anxious to cement [their] financial arrangements . . . regarding the equipment development," which to

23

Yu also testified that neither Yantai Jereh nor American Jereh ever did any business with the BJ Services representatives who attended the February 8, 2017 dinner. Following the February 8, 2017 dinner, BJ Services was not interested in working with Yantai Jereh. And "the whole concept of business with BJ Services went cold from" March 2017 until around December 2018. Yu considered the February 8, 2017 dinner to be a "total failure." Yu noted that she did speak with Clarke in March 2017 about BJ Services, and Clarke sent a letter to Yu that he proposed Wang send to Vredeveld at BJ Services. Although Wang ultimately sent Vredeveld a letter, she did not work for American Jereh and Yantai Jereh received no response to Wang's letter.

In December 2018, Yu received a call from Fussell, who was a third-party consultant for Yantai Jereh. Fussell told Yu that he had a contact at BJ Services named Samir Seth, who was an independent consultant for BJ Services. Yu subsequently met with Seth and agreed to send him some information to try to start some business with BJ Services related to the selling of an "electric turbine frac fleet" to BJ Services. This was the genesis of the November 2019 sales contract.

According to Yu, negotiations with BJ Services continued for months, and Yu testified as to several communications between herself, Seth, and Fu, who worked

_____

Yu indicated that Clarke knew no agreement between them had ever been "cement[ed]."

24

for BJ Services, that ultimately resulted in the November 2019 sales contract. Yu explained that on November 20, 2019, BJ Services and Yantai Jereh, "for itself" and on behalf of American Jereh, entered the November 2019 sales contract. But Clarke was not directly involved with the November 2019 sales contract in any way nor was Allcorn from BJ Services. According to Yu, Clarke was making a false claim that she ever entered into an agreement with him.

Fu testified that he worked for BJ Energy Solutions, but he previously worked for BJ Services beginning in January 2017 as the director of technology. At that time, Fu was "responsible for . . . software and chemistry." In 2017, he was not involved with the purchase and sale of equipment by BJ Services.

According to Fu, he was a member of the team at BJ Services who negotiated the November 2019 sales contract. As to the origination of the November 2019 sales contract, Fu stated that it began in December 2018 and early 2019 with Seth, whom BJ Services had hired as a consultant to gather information about a potential "new frac fleet." Fu, Seth, and Zemiak were the BJ Services's representatives involved at the "inception point." Fu did not work on any projects with Jereh until December 2018.

In negotiating the November 2019 sales contract, Fu explained that he mainly dealt with Yu and Liu from Jereh. He believed that those negotiations involved people from American Jereh and Yantai Jereh.

25

Fussell testified in late 2018, American Jereh hired him as a "contract sales consultant." Before working as a consultant for American Jereh though, Fussell signed a written consulting agreement with American Jereh. Fussell explained that the agreement provided that he would receive "a commission based on an actual transaction taking place"; "if [he] . . . brought an opportunity to the table that [went] all the way to a contract signing and then a payment was issued, that[] [would be] when [he] would . . . qualif[y] for a commission." Fussell further noted that to be paid, he would need "to find a customer that Jereh was not already communicating with" and provide that customer with information about the "direct drive turbine equipment [or] electric frac equipment" that Jereh "want[ed] to sell." Fussell would also need to "advance [the customer] to the point where [it] w[as] interested in doing a field trial" because it was "Jereh's hope . . . that by executing the field trial, . . . [the] customer would then purchase an entire fleet or purchase additional equipment."

In late 2018, Fussell began reaching out to acquaintances and customers in the industry and "asked if they were looking [at certain] types of equipment," specifically, "[d]irect drive turbine equipment and electric frac equipment," "so that [he] could notify them of the offerings that Jereh had." Fussell reached out to Adam Brazeal, whom Fussell had known for years and who worked for BJ Services. Brazeal put Fussell in touch with Seth, who BJ Services had hired to compare

26

"electric frac and direct drive turbine technology" and evaluate various sellers. Fussell had multiple telephone calls and conference calls with Seth and gave multiple presentations. In the end, Seth appeared to be most interested in "direct drive turbine [technology]." Once BJ Services was ready to enter commercial discussions with American Jereh, Fussell contacted Yu so that BJ Services and Jereh could discuss and begin negotiating a contract. Sometime during the first part of 2019, Fussell "turned over the information" to Yu.

According to Fussell, BJ Services and American Jereh ultimately entered the November 2019 sales contract, and Fussell earned his commission. However, instead of accepting his commission, Fussell used his "commission as a way to negotiate for full-time employment" with American Jereh.

As to Clarke, Fussell testified that Clarke was "trying to be paid for [his] work." Clarke did not have any involvement with the origination or negotiation of the November 2019 sales contract. The November 2019 sales contract related to the purchasing of direct drive turbine equipment.

The jury found in favor of Clarke on his breach-of-contract, promissory-estoppel, and quantum-meruit claims. As to his breach-of-contract claim, the jury found that "Clarke and American Jereh [had] agree[d] that American Jereh would pay Clarke for consulting services for the contract entered into between American Jereh and BJ Services"; American Jereh failed to comply with the

27

agreement; and American Jereh's failure to comply with the agreement was not excused. The jury awarded Clarke $1,280,000 in damages on his breach-of-contract claim.

As to his promissory-estoppel claim, the jury found that Clarke had "substantially rel[ied] to his detriment on American Jereh's promise" and the "reliance [was] foreseeable by American Jereh." But the jury did not award Clarke any damages related to his promissory-estoppel claim.

As to his quantum-meruit claim, the jury found that Clarke had "perform[ed] compensable work for American Jereh for which he was not compensated," and it awarded him $87,500 in damages on his quantum-meruit claim.

Clarke then filed a motion for judgment on the verdict and a motion for award of attorney's fees, electing to recover on his breach-of-contract claim and requesting that the trial court award him $257,584.22 in attorney's fees based on the jury's findings on Clarke's breach-of-contract claim.[23] The trial court entered judgment based on the jury's findings, awarding Clarke $1,280,000 on his breach-of-contract claim and $257,584.22 in attorney's fees, plus interest and court costs.

### Breach of Contract

In its first and second issues, American Jereh argues that the trial court erred in rendering judgment in favor of Clarke on his breach-of-contract claim because the

---

[23] *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001.

oral agreement on which Clarke relied was unenforceable as a matter of law as it did not contain all essential terms and violated the statute of frauds.

Whether a contract is enforceable as a matter of law is a question that we review de novo. *See In re Humphreys*, 880 S.W.2d 402, 404 (Tex. 1994); *W. Beach Marina, Ltd. v. Erdeljac*, 94 S.W.3d 248, 254 (Tex. App.—Austin 2002, no pet.); *Gaede v. SK Invs., Inc.*, 38 S.W.3d 753, 757 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

The existence of a valid contract an essential element of a breach-of-contract claim. *See Dupree v. Boniuk Interests, Ltd.*, 472 S.W.3d 355, 364 (Tex. App.—Houston [1st Dist.] 2015, no pet.) (setting out elements of breach-of-contract claim). Parties form a binding contract when the following elements are present: (1) an offer; (2) an acceptance in strict compliance with the terms of the offer; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Winchek v. Am. Express Travel Related Servs. Co.*, 232 S.W.3d 197, 202 (Tex. App.—Houston [1st Dist.] 2007, no pet.); *see also David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) ("A meeting of the minds is necessary to form a binding contract.").

An enforceable and legally binding contract exists if it is sufficiently definite, certain, and clear in its essential terms. *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 (Tex. 2000); *T.O. Stanley Boot Co. v. Bank of El Paso*,

29

847 S.W.2d 218, 221 (Tex. 1992). A binding agreement may exist when parties agree on some terms sufficient to create a contract, leaving other provisions for later negotiation. *Gen. Metal Fabricating Corp. v. Stergiou*, 438 S.W.3d 737, 744 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *Crisp Analytical Lab, L.L.C. v. Jakalam Props., Ltd.*, 422 S.W.3d 85, 89 (Tex. App.—Dallas 2014, pet. denied). "When an agreement leaves essential (or material) matters open for future negotiation and those negotiations are unsuccessful, however, the agreement is not binding upon the parties and merely constitutes an agreement to agree." *Stergiou*, 438 S.W.3d at 744 (internal footnote and quotations omitted).

The question of what terms are essential to a contract is determined on a contract-by-contract basis, depending on the subject matter of the contract at issue. *T.O. Stanley Boot Co.*, 847 S.W.2d at 221. The parties must have a meeting of the minds and must communicate consent to the essential terms of the alleged agreement, which is determined based on an objective standard of what the parties said and did rather than on their subjective states of mind. *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1, 17 (Tex. App.—Houston [1st Dist.] 2005, pet. denied); *Angelou v. African Overseas Union*, 33 S.W.3d 269, 279–80 (Tex. App.— Houston [14th Dist.] 2000, no pet.).

Here, American Jereh argues that the February 8, 2017 oral agreement did not contain all essential terms because Clarke relied on the discussion that he had with

Yu in the parking lot after the February 8, 2017 dinner to establish that he had an oral agreement with American Jereh. And Clarke admits that the only thing he and Yu discussed at that time was that he would receive a five percent commission "on sales." (Internal quotations omitted.) According to American Jereh, Clarke and Yu did not discuss the "definition of sales," the "timeline for payments on any of the . . . commission-bearing sales," Clarke's duties under the oral agreement, whether the oral agreement would be between Clarke and American Jereh, and "the duration or scope of the [oral] agreement." (Internal quotations omitted.)

At trial, Clarke testified that he had an oral agreement with American Jereh, which he claimed was breached.[24] According to Clarke, the oral agreement arose out of a conversation between himself and Yu on February 8, 2017. Clarke testified that at the end of the February 8, 2017 dinner with BJ Services, which both Clarke and Yu attended, Clarke said to Yu: "Are you good with [five] percent?" And Yu responded: "Yes, I'm good." Clarke stated that February 8, 2017 was the date that he and American Jereh entered into an oral agreement, but he admitted that the only term they had agreed to that night was his five percent commission of "sales." Further, Clarke testified that he and Yu did not discuss the meaning of "sales" on February 8, 2017, which Clarke admitted could mean "a bunch of different things."

---

[24]  Clarke admitted that "there was never a written agreement" between himself and any Jereh entity.

And they also did not discuss the payment period. "The specific thing [that he and Yu] discussed at [the February 8, 2017] dinner was the commission." Clarke also noted that Yu never told him that she worked for American Jereh—the Jereh entity that he asserted he had an oral agreement with.

As noted above, a contract must be sufficiently definite in its terms to be legally binding. *T.O. Stanley Boot Co.*, 847 S.W.2d at 221. An "essential" term is

> one that the parties reasonably regarded, at the time of contracting, as a vitally important ingredient in their bargain. Failure to fulfill such a promise, in other words, would seriously frustrate the expectations of one or more of the parties as to what would constitute sufficient performance of the contract as a whole.

*Neeley v. Bankers Tr. Co. of Tex.*, 757 F.2d 621, 628 (5th Cir. 1985) (internal quotations omitted); *see also Cytogenix, Inc. v. Waldroff*, 213 S.W.3d 479, 485 (Tex. App.—Houston [1st Dist.] 2006, pet. denied). Several courts have interpreted "essential" terms to include the names of the parties, the time of performance, the price to be paid, the work to be done, and the service to be rendered. *See Liberto v. D.F. Stauffer Biscuit Co.*, 441 F.3d 318, 324 (5th Cir. 2006). Further, the basic obligations of the parties should be clearly outlined. *See Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 838–39 (Tex. 2010).

Here, the February 8, 2017 oral agreement, which Clarke asserts was the contract that American Jereh breached, lacks clear, certain, and definite terms, which are necessary for an enforceable contract. *See Gannon v. Baker*, 830 S.W.2d 706,

710 (Tex. App.—Houston [1st Dist.] 1992, writ denied). And it leaves the Court unable to determine the obligations of the parties. *See Weitzman v. Steinberg*, 638 S.W.2d 171, 175 (Tex. App.—Dallas 1982, no writ). Notably, the "only thing" that Clarke and Yu discussed after the February 8, 2017 dinner was whether she would agree to a five percent commission of "sales." *See T.O. Stanley Boot Co.*, 847 S.W.2d at 221–22 (contract unenforceable when there was "evidence of only one material element"). Clarke testified that he did not discuss any "other terms" with Yu because he was "not going to sit down and go through a contract in a parking lot." Absent from the purported February 8, 2017 oral agreement was, among other things, a "definition of sales," a timeline for payments to Clarke, Clarke's duties and obligations under the agreement, the duration and scope of the agreement, and who the parties to the agreement were. Essential terms cannot be retroactively added to a contract "which the parties were unable to complete by mutual agreement." *Weitzman*, 638 S.W.2d at 175 (noting courts "cannot make contracts for the parties" and "a jury [cannot] supply an essential term in the contract which the parties were unable to complete by mutual agreement"); *see also Soliman v. Goltz*, No. 05-93-00008-CV, 1993 WL 402740, at *7 (Tex. App.—Dallas Oct. 6, 1993, no writ) (not designated for publication) ("[C]ourts are without authority to supply missing terms of a contract which the parties themselves had either not seen fit to place in their agreement, or which they omitted to agree upon."); *Mooney v. Ingram*, 547

33

S.W.2d 314, 317 (Tex. App.—Dallas 1977, writ ref'd n.r.e.) (where agreement leaves essential term for later determination and it is never determined, no enforceable contract exists).

Accordingly, we conclude that the February 8, 2017 oral agreement did not constitute an enforceable contract because it lacked essential terms.

We note that at trial Clarke testified that although the February 8, 2017 oral agreement only addressed a "[five] percent commission," the rest of the agreement was "pre-ordained." And according to Clarke, Yu knew that the rest of their agreement would be "in line" with the 2014 Cooperation Agreement. Clarke testified that he and Yu "both knew that the agreement [they] agreed to was the same agreement that [they] agreed to in 2014"—"[s]ame terms, same situation." However, although Clarke stated that he viewed the 2014 Cooperation Agreement as a "template" for his later agreements with Jereh entities, he also testified that the "template" would need to be amended or changed "here or there." Thus, by his own testimony, Clarke conceded that the 2014 Cooperation Agreement could not supply the missing essential terms from the February 8, 2017 oral agreement because the terms of the 2014 Cooperation Agreement would have to be amended or changed "here or there."

Further, even were we to presume, without deciding, that the February 8, 2017 oral agreement incorporated the terms from the 2014 Cooperation Agreement so that

34

Clarke could avoid his lack-of-essential-terms problem, we note that under the statute of frauds, an agreement that "cannot be fully performed within one year is not enforceable unless there is a writing signed by the party against which enforcement is sought."[25] *Westside Wrecker Serv., Inc. v. Skafi*, 361 S.W.3d 153, 162 (Tex. App.—Houston [1st Dist.] 2011, pet. denied); *see* TEX. BUS. & COM. CODE ANN. § 26.01(a), (b)(6).

As to the 2014 Cooperation Agreement, Clarke testified that it was between him and Yantai Jereh, and it stated that Clarke would assist Yantai Jereh in establishing a business relationship with customers and supplying equipment to customers. Under the 2014 Cooperation Agreement, if Yantai Jereh was "successfully awarded" a contract "through [a] bid or direct negotiation with [the] direct assistance" of Clarke and a contract was "formally signed," then Clarke would receive a three percent commission "of the contract value." Clarke's commission would be due and payable within fifteen days of the day on which Yantai Jereh received payment from its customer. The 2014 Cooperation Agreement stated that it was valid for three years.

---

[25] Whether an agreement falls within the statute of frauds is a question of law that we review de novo. *See Nat'l Prop. Holdings, L.P. v. Westergren*, 453 S.W.3d 419, 426 (Tex. 2015); *Holloway v. Dekkers*, 380 S.W.3d 315, 321 (Tex. App.—Dallas 2012, no pet.).

The three-year term in the 2014 Cooperation Agreement was an essential term which Clarke admittedly did not discuss, amend, or change in his discussion with Yu after the February 8, 2017 dinner. And as such, according to Clarke's own testimony, the three-year term was meant to be carried over from the 2014 Cooperation Agreement to his February 8, 2017 oral agreement.

"A contract for performance that is intended to span a period of more than one year falls within the statute of frauds . . . ." *Westside Wrecker*, 361 S.W.3d at 164. Thus, Clarke's February 8, 2017 oral agreement, which Clarke asserts American Jereh breached, was intended to last for three years and was required to be in writing. *See Young v. Ward*, 917 S.W.2d 506, 508 (Tex. App.—Waco 1996, no writ) (explaining "[a]greements which demand performance at or for a specified amount of time are easily determined by the court to fall or not fall under the" statute of frauds); *see, e.g.*, *Gilliam v. Kouchoucos*, 340 S.W.2d 27, 27–30 (Tex. 1960) (employment contract for ten years clearly fell within statute of frauds); *Ward v. Sponseller*, No. 09-19-00441-CV, 2021 WL 5498222, at *4 (Tex. App.—Beaumont Nov. 24, 2021, no pet.) (mem. op.) (parties' oral agreement "was not performable within one year as the terms required [party] 'to stay onboard for five years'"); *Holloway v. Dekkers*, 380 S.W.3d 315, 321–22 (Tex. App.—Dallas 2012, no pet.) (where parties' oral agreement was for term that "plainly exceeded one year," statute of frauds applied and agreement was unenforceable). Because the February 8, 2017

oral agreement was not in writing, it is not enforceable under the statute of frauds. *See Royle v. Tyler Pipe Indus., Inc.*, 6 S.W.3d 593, 594 (Tex. App.—Tyler 1999, pet. denied).

Based on the foregoing, we conclude that the February 8, 2017 oral agreement was unenforceable as a matter of law, and we hold that the trial court erred in rendering judgment in favor of Clarke on his breach-of-contract claim against American Jereh.

We sustain American Jereh's first and second issues.

### Attorney's Fees

In its third issue, American Jereh argues that the trial court erred in awarding Clarke attorney's fees on his breach-of-contract claim because the February 8, 2017 oral agreement was unenforceable.

A party cannot recover attorney's fees unless permitted by statute or contract. *Holland v. Wal–Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999); *Waldroff*, 213 S.W.3d at 489. A party who prevails on a breach-of-contract claim and recovers damages may recover his reasonable attorney's fees under Texas Civil Practice and Remedies Code 38.001. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001; *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 666 (Tex. 2009); *LG Ins. Mgmt. Servs., L.P. v. Leick*, 378 S.W.3d 632, 640 (Tex. App.—Dallas 2012, pet. denied). The availability of attorney's fees under a particular statute is a question of

law for the court. *Holland*, 1 S.W.3d at 94; *Alta Mesa Holdings, L.P. v. Ives*, 488 S.W.3d 438, 453 (Tex. App.—Houston [14th Dist.] 2016, pet. denied).

Here, the trial court's judgment stated that Clarke had "elected to recover under [his] breach[-]of[-]contract claim" and it awarded him $1,280,000 in damages on his breach-of-contract claim. It also awarded Clarke $257,548.22 in attorney's fees "pursuant to [s]ection 38.001 of the Texas Civil Practice and Remedies Code for prevailing on his breach-of-contract claim." On appeal, however, we have concluded that the February 8, 2017 oral agreement, on which Clarke's breach-of-contract claim was based, was unenforceable as a matter of law. And we have held that the trial court erred in rendering judgment in favor of Clarke on his breach-of-contract claim against American Jereh. Because Clarke has not prevailed on his breach-of-contract claim, he is not entitled to attorney's fees under Texas Civil Practice and Remedies Code 38.001. *See, e.g.*, *Wilson & Wilson Tax Servs., Inc. v. Mohammed*, 131 S.W.3d 231, 240 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (where appellate court concluded party could not prevail on breach-of-contract claim, appellate court also reversed attorney's fees award under Texas Civil Practice and Remedies Code 38.001). Accordingly, we hold that the trial court erred in awarding Clarke $257,548.22 in attorney's fees "pursuant to [s]ection 38.001 of the Texas Civil Practice and Remedies Code for prevailing on his breach-of-contract claim."

We sustain American Jereh's third issue.

**Conclusion**

We reverse the judgment of the trial court to the extent that it awarded damages and attorney's fees to Clarke on his breach-of-contract claim. We render judgment that Clarke take nothing on his breach-of-contract claim and his request for attorney's fees related to his breach-of-contract claim. Because Clarke may be entitled to seek judgment on his alternative quantum-meruit claim, we remand the case to the trial court for consideration of the jury's alternative finding and Clarke's request for attorney's fees related to his alterative quantum-meruit claim.[26] *See Charlie Thomas Chevrolet, Ltd. v. Martinez*, 590 S.W.3d 9, 20 (Tex. App.—Houston [1st Dist.] 2019, no pet.); *Landing Cmty. Improvement Ass'n v. Young*, No. 01-15-00816-CV, 2018 WL 2305540, at *24 (Tex. App.—Houston [1st Dist.] May 22, 2018, pet. denied) (mem. op.).

---

[26] Although the trial court entered judgment on the jury's findings in favor of Clarke on his breach-of-contract claim, the jury also found in his favor on his quantum-meruit claim and awarded him damages in the amount of $87,500. When, as here, "a party tries a case on alternative theories of recovery and a jury returns favorable findings on two or more theories, the party has a right to a judgment on the theory entitling him to the greatest or most favorable relief." *Boyce Iron Works, Inc. v. Sw. Bell Tel. Co.*, 747 S.W.2d 785, 787 (Tex. 1988); *Strebel v. Wimberly*, 371 S.W.3d 267, 286 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). "[A]n election by the prevailing party is not necessary" and that party "may seek recovery under an alternative theory if the judgment is reversed on appeal." *Boyce Iron Works, Inc.*, 747 S.W.2d at 787.

Julie Countiss
Justice

Panel consists of Chief Justice Adams and Justices Hightower and Countiss.